*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 10a0334p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

SHELLEY EVANS-MARSHALL,
                    *Plaintiff-Appellant,*

          *v.*

BOARD OF EDUCATION OF THE TIPP CITY
EXEMPTED VILLAGE SCHOOL DISTRICT;
CHARLES W. WRAY;  JOHN T. ZIGLER,
                    *Defendants-Appellees.*

No. 09-3775

Appeal from the United States District Court
for the Southern District of Ohio at Dayton.
No. 03-00091—Walter H. Rice, District Judge.

Decided and Filed:  October 21, 2010

Before:  SILER and SUTTON, Circuit Judges; CLELAND, District Judge.[*]

_____

**COUNSEL**

**ON BRIEF:** Lynnette Dinkler, Jamey T. Pregon, DINKLER PREGON LLC, Dayton,
Ohio, for Appellees.  Shelley Evans-Marshall, Humble, Texas, pro se.

_____

**OPINION**

_____

SUTTON, Circuit Judge.  Does a public high school teacher have a First (and
Fourteenth) Amendment right "to select books and methods of instruction for use in the
classroom without interference from public officials"?  Yes, says the teacher, Shelley
Evans-Marshall.  No, says the Tipp City Board of Education.  Because the right to free
speech protected by the First Amendment does not extend to the in-class curricular

_____
[*]The Honorable Robert H. Cleland, United States District Judge for the Eastern District of
Michigan, sitting by designation.

1

speech of teachers in primary and secondary schools made "pursuant to" their official duties, *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006), we affirm the judgment rejecting this claim as a matter of law.

## I.

In 2000, the Tipp City Board of Education hired Evans-Marshall to teach English and to supervise Tippecanoe High School's literary magazine, BirchBark, for the 2000–2001 school year. The Board renewed her contract for the 2001–2002 school year, when Evans-Marshall taught English to 9th and 11th grade students and a creative writing course to 11th and 12th grade students. At the beginning of the fall semester, Evans-Marshall assigned Ray Bradbury's *Fahrenheit 451* to her 9th graders. To the end of exploring the book's theme of government censorship, she distributed a list compiled by the American Library Association of the "100 Most Frequently Challenged Books." Students divided into groups, and Evans-Marshall asked each group to pick a book from the list, to investigate the reasons why the book was challenged and to lead an in-class debate about the book. Two groups chose *Heather Has Two Mommies* by Lesléa Newman.

A parent complained about *Heather Has Two Mommies*, and the principal, Charles Wray, asked Evans-Marshall to tell the students to choose a different book. She complied, explaining to her class that "they were in a unique position to . . . use this experience as source material for their debate because they were in the . . . position of having actually experienced censorship in preparing to debate censorship." R.31-2 at 342–43. After the class completed the *Fahrenheit 451* unit, Evans-Marshall assigned *Siddhartha* by Hermann Hesse and used it as the basis for in-class discussions about "spirituality, Buddhism, romantic relationships, personal growth, [and] familial relationships." R.31-1 at 101.

At the October 2001 meeting of the school board, twenty-five or so parents complained about the curricular choices in the schools, including *Siddhartha* and the book-censorship assignment. The next day, Principal Wray called a meeting of the

English department and told Evans-Marshall that she was "on the hot seat." R.31-1 at 64. Nearly 100 parents, as well as the local news media, attended the board's November meeting. For over an hour, parents expressed concerns about books in the curriculum and in the school libraries. While the parents mentioned many books, they raised particular objections to the materials in Evans-Marshall's classroom and her teaching methods. Superintendent John Zigler explained that the school board had purchased many of the materials, including *Siddhartha*, several years before, making it difficult to criticize Evans-Marshall for teaching a book the school board had bought. "You should be embarrassed," one parent responded, referring to the explicit language and sexual themes in the book. R.46 at 1:32:20. Another parent complained that she had asked for an alternative assignment—instead of *Siddhartha*—and "was given three books," two of which "were for a four-to-eight year old." R.46 at 1:33:40. "I'm not going to put my daughter through this," the parent added, explaining that she thought Evans-Marshall was "punish[ing] my daughter." R.46 at 1:33:40. A group of parents presented the board with a 500-signature petition calling for "decency and excellence" in the classroom. R.46 at 0:29:00, 0:55:00.

The meeting was not one-sided. A member of the board—a parent himself—warned that the school district's policies about potentially objectionable material "have to be well thought out because what you might find offensive, I might not." R.46 at 1:41:40. Another board member reminded the group that, as elected officials, the board "must walk the middle of the road to some extent," even if the community might "err . . . on the conservative side." R.46 at 0:20:45. And a parent who made a formal statement said that he "[did not] condone" the behavior of some of the more vocal parents and trusted that school officials "want what's best for our kids." R.46 at 0:22:00.

The matter did not end there. In teaching creative writing, Evans-Marshall maintained a file of student writing samples that she shared with students who asked for additional guidance on assignments. Running low on copies of some of the samples, she sent three of them to support staff to be copied. A member of the copy room staff,

apparently not a friend, showed the writing samples to Wray, saying he "ought to read this." R.33-1 at 76. After reading the papers, Wray called Evans-Marshall to his office. When she arrived, he waved two of the writing samples in his hand, one a first-hand account of a rape, the other a story about a young boy who murdered a priest and desecrated a church. "[A]re you going to use these in class after everything that's happened?" he shouted. R.31-1 at 84. Evans-Marshall explained that the writing samples were not intended for in-class distribution and that she would refrain from sharing the papers if he wanted. Wray said that he did not like the materials she was using in her classroom or the themes of her in-class discussions and that he "intended to rei[n] it in." R.41 at 24–25.

The two soon had another argument in the school library about Evans-Marshall's plans to give a final exam involving group discussions and student self-evaluations. Evans-Marshall asked Wray to give her a model exam so she could "give [him] back exactly what [he] want[ed]," R.31-1 at 43, prompting Wray to call her a "smart a—," *id.* at 41–42. The next day, Evans-Marshall complained to Superintendent Zigler about Wray's behavior. Zigler told her to meet with Wray after the semester break to work things out and offered to speak with Wray in the meantime. He also said that she should feel free to file a formal grievance if things had not been worked out by January.

Things did not work out by January. Wray and Evans-Marshall talked, but they fell back into the same channels of disagreement. Evans-Marshall asked whether there was anything aside from her curricular decisions that bothered Wray. "I'll see what other issues I can come up with," Wray responded, "for your evaluation next week." R.31-1 at 52–53. Wray's evaluations criticized Evans-Marshall's attitude and demeanor as well as her "[u]se of material that is pushing the limits of community standards." R.31-5 at 38–39. Evans-Marshall filed written objections to Wray's evaluations and a grievance with Superintendent Zigler.

At its March 2002 meeting, the school board voted unanimously not to renew Evans-Marshall's contract. She requested an explanation, and the school board sent her

a letter on April 9, 2002, saying that her non-renewal was "due to problems with communication and teamwork." R.31-6 at 10. At Evans-Marshall's request, the board held a formal hearing about the employment decision. Principal Wray, Superintendent Zigler and Evans-Marshall all testified, and the board again voted unanimously not to renew her contract.

(The alert reader may notice that some of the factual allegations raised in Evans-Marshall's complaint and addressed in our first decision do not appear here. *See Evans-Marshall v. Bd. of Educ.*, 428 F.3d 223, 226–27 (6th Cir. 2005) (*Evans-Marshall I*). The distinction between a Civil Rule 12(b)(6) and a Civil Rule 56 appeal explains the difference. As is often the case, discovery will confirm the accuracy of some allegations and disprove others. We recount today only the allegations in the complaint backed up by "the pleadings, the discovery and disclosure materials on file, and any affidavits." Fed. R. Civ. P. 56(c)(2).)

In March 2003, Evans-Marshall filed this § 1983 action against the school board, Wray and Zigler. She alleged that the school board and other defendants had retaliated against her "curricular and pedagogical choices," infringing her First Amendment right "to select books and methods of instruction for use in the classroom without interference from public officials." R.1 ¶¶ 32, 36. The defendants moved to dismiss the complaint for failure to state a claim under Civil Rule 12(b)(6), but the district court held that Evans-Marshall had sufficiently alleged a First Amendment violation. We affirmed. *Evans-Marshall I*, 428 F.3d 223.

After discovery by both sides, the defendants again moved for summary judgment, arguing that the Supreme Court's intervening decision in *Garcetti v. Ceballos*, 547 U.S. 410 (2006), and the unrebutted facts gleaned from discovery foreclosed Evans-Marshall's claim. In the alternative, they sought summary judgment on the ground that the school board should prevail under the balancing test announced in *Pickering v. Board of Education*, 391 U.S. 563, 572–73 (1968), or that there was no causal link between Evans-Marshall's curricular choices and the non-renewal of her contract. The

district court granted the defendants' summary judgment motion.  It declined to apply *Garcetti* to the dispute and held that Evans-Marshall's teaching methods and curricular choices survived the *Pickering* balancing test.  But it concluded that she had not provided sufficient evidence "link[ing] her teaching" methods and curricular choices to "the Board's decision to not renew her contract."  R.52 at 47.

## II.

This free-speech-retaliation case implicates two competing intuitions.  On the one side, doesn't a teacher have the First Amendment right to choose her own reading assignments, decide how they should be taught and above all be able to teach a unit on censorship without being censored or otherwise retaliated against?  On the other side, doesn't a school board have the final say over what is taught, and how, in the public schools for which it is responsible?  Who wins depends on which line of legal authority controls.

## A.

In free-speech retaliation cases arising in the employment context, we ask three questions:  Was the individual involved in "constitutionally protected" activity—here activity protected by the free speech clause of the First Amendment?  *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977).  Would the employer's conduct discourage individuals of "ordinary firmness" from continuing to do what they were doing?  *Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir. 1998); *see Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982).  Was the employee's exercise of constitutionally protected rights "a motivating factor" behind the employer's conduct?  *Mt. Healthy*, 429 U.S. at 287.  The claimant must win each point to prevail.

The first question requires some elaboration.  Three Supreme Court cases define the contours of the free-speech rights of public employees.

*The "matters of public concern" requirement*.  The First Amendment protects the speech of employees only when it involves "matters of public concern."  *Connick v.*

*Myers*, 461 U.S. 138, 143 (1983).  In *Connick*, an assistant district attorney, after learning that her supervisor planned to transfer her, solicited information from her colleagues about the office's transfer policy, about office morale and about whether supervisors had pressured anyone to participate in political campaigning.  *Id.* at 141. When the supervisor fired her for refusing to accept the transfer, she sued, alleging retaliation against protected speech, namely her initiation of the survey.  *Id.*  In rejecting her claim, the Court explained that not all employee speech is protected, only speech that "fairly [may be] considered as relating to" issues "of political, social, or other concern to the community."  *Id.* at 146.  When, by contrast, an employee's speech does not relate to a matter of public concern, public officials enjoy "wide latitude" in responding to it without "intrusive oversight by the judiciary in the name of the First Amendment."  *Id.*

     *The "balancing" requirement.*  If the employee establishes that her speech touches "matters of public concern," a balancing test determines whether the employee or the employer wins.  *See Pickering*, 391 U.S. at 568.  In *Pickering*, the Court considered the claim of a high school teacher whom the principal fired after the teacher wrote a letter to the local newspaper, criticizing the school board's budgetary decisions. *Id.* at 564.  In resolving the claim, the Court "balance[d] . . . the interests of the teacher, as a citizen, in commenting upon matters of public concern" against "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."  *Id.* at 568.  Reasoning that there was no relationship between the contents of the letter and the "proper performance of [the teacher's] daily duties in the classroom," the Court ruled for the teacher, concluding that the school board's interests did not outweigh his desire to "contribute to public debate" like any other citizen.  *Id.* at 572–73.

     *The "pursuant to" requirement.*  In the last case in the trilogy, a prosecutor reviewed a private complaint that a police officer's affidavit used to obtain a search warrant contained several misrepresentations.  *Garcetti*, 547 U.S. at 413–14.  After confirming that the affidavit contained serious falsehoods, the prosecutor wrote a memo to his superiors about his findings, recommended that the office dismiss the case and

eventually testified to the same effect at a hearing to suppress the evidence discovered during the search. *Id.* at 414–15. In the aftermath of these and other actions, the prosecutor claimed that the office retaliated against him by transferring him to another courthouse and by denying him a promotion. *Id.* at 415. In rejecting his free-speech claim, the Court did not deny that the prosecutor's speech related to a matter of "public concern" under *Connick*, and it did not take on the lower court's reasoning that *Pickering* balancing favored the employee. It instead concluded that the First Amendment did not apply. "The controlling factor," the Court reasoned, "is that his expressions were made *pursuant to* his duties as a calendar deputy," making the relevant speaker the government entity, not the individual. *Id.* at 421 (emphasis added). "We hold that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.*

B.

A First Amendment claimant must satisfy *each* of these requirements: the *Connick* "matter of public concern" requirement, the *Pickering* "balancing" requirement and the *Garcetti* "pursuant to" requirement. Evans-Marshall clears the first two of these hurdles but not the third.

The content of Evans-Marshall's speech "relat[ed] to . . . matter[s] of political, social, or other concern to the community." *Connick*, 461 U.S. at 146. A teacher's curricular speech, we have said on several occasions, ordinarily covers these matters. *See Evans-Marshall I*, 428 F.3d at 230–31; *Cockrel v. Shelby County Sch. Dist.*, 270 F.3d 1036, 1052 (6th Cir. 2001); *Hardy v. Jefferson Cmty. Coll.*, 260 F.3d 671, 679 (6th Cir. 2001). "[T]he essence of a teacher's role is to prepare students for their place in society as responsible citizens," *Hardy*, 260 F.3d at 679, and the teacher that can do that *without* covering topics of public concern is rare indeed, perhaps non-existent. Look no further than the November 2001 meeting of the school board to confirm the point. Members of the community had a lot to say about the topics discussed in Evans-

Marshall's class, and they went to the school board meeting to say it. That large segments of the community disagreed with Evans-Marshall's speech—her class assignments and teaching methods—is beside the point. The question is whether the topics discussed are "of . . . concern" to the community, *Connick*, 461 U.S. at 146, not whether the community approved of the teacher's position on each topic. On this summary-judgment record, Evans-Marshall's curricular speech passes the *Connick* "matter of public concern" test, as the district court correctly determined.

Evans-Marshall also satisfies *Pickering* "balancing"—that her "interests . . . as a citizen, in commenting upon matters of public concern" through her in-class speech outweighed the school board's "interest . . . as an employer, in promoting the efficiency of the public services it performs." *Pickering*, 391 U.S. at 568. As the district court correctly concluded, a legitimate factual dispute exists over whether Evans-Marshall's interest in teaching *Siddhartha* (and in making other curricular choices) overshadowed any interest the school board might claim in disciplining her for doing so. Although the school board has "the ability to select and require adherence to a . . . stated curriculum," R.52 at 26, the court concluded, its interest in enforcing curricular standards is severely undermined if it disciplines a teacher for teaching a book the board "had purchased . . . and made . . . available to teachers as an optional text," *id.* at 40–41. And although the court did not find Evans-Marshall's interest in "select[ing] materials to supplement the Board-chosen textbooks . . . and the methods for teaching" to be compelling, *id.* at 32, that interest outweighed the school's near-zero interest in disciplining her for teaching a book it had purchased, *id.* at 41. We agree—for many of the same reasons identified in *Evans-Marshall I*. *See* 428 F.3d at 231–32.

After addressing the *Pickering* point, however, the district court concluded that Evans-Marshall stumbled over causation. The court did not believe that Evans-Marshall could show that her exercise of free speech rights was "a motivating factor" behind the school board's conduct. *See Mt. Healthy*, 429 U.S. at 287. That is a harder point to sell. And a brief accounting of the evidence and the chronology of events shows why.

Before any parents complained about her reading assignments and classroom discussions, Evans-Marshall had never received a negative performance review. Dozens of parents flooded the school board's November 2001 meeting, and many complained about Evans-Marshall's teaching. One parent told the school board that it "should be embarrassed" about the book she was teaching. R.46 at 1:32:20. Principal Wray thereafter told Evans-Marshall that she would have to clear any potentially controversial material with him. He later told Evans-Marshall that he "intended to rei[n] . . . in" her classroom discussions. R.41 at 24–25. In December 2001, Evans-Marshall complained to Superintendent Zigler about Wray's behavior. And when the semester resumed in January 2002, Wray told Evans-Marshall that he would "see what . . . [he could] come up with for [her] evaluations," R.31-1 at 52–53, after which he gave her negative performance reviews for the first time. Only a short time later, the board voted not to renew her contract. To deny a causal relationship between Evans-Marshall's speech and the Board's actions does not come to grips with this sequence of events or with the imperative at this stage of the litigation that we draw all inferences in favor of the non-moving party: the teacher. Evans-Marshall satisfies *Pickering* balancing and has shown that her teaching choices caused the school board to fire her.

Evans-Marshall, however, cannot overcome *Garcetti*. When government employees speak "pursuant to their official duties," *Garcetti* teaches that they are "not speaking as citizens for First Amendment purposes." 547 U.S. at 421. Any dispute over the board's motivations, *Pickering* balancing or the "public concerns" of her speech under *Connick* is beside the point if, as Evans-Marshall does not dispute, she made her curricular and pedagogical choices in connection with her official duties as a teacher.

In the light cast by *Garcetti*, it is clear that the First Amendment does not generally "insulate" Evans-Marshall "from employer discipline," *Garcetti*, 547 U.S. at 421, even discipline prompted by her curricular and pedagogical choices and even if it otherwise appears (at least on summary judgment) that the school administrators treated her shabbily. When a teacher teaches, "the school system does not 'regulate' [that] speech as much as it *hires* that speech. Expression is a teacher's stock in trade, the

commodity she sells to her employer in exchange for a salary." *Mayer v. Monroe County Cmty. Sch. Corp.*, 474 F.3d 477, 479 (7th Cir. 2007). And if it is the school board that hires that speech, it can surely "regulate the content of what is or is not expressed," *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 833 (1995), what is expressed in other words on its behalf. Only the school board has ultimate responsibility for what goes on in the classroom, legitimately giving it a say over what teachers may (or may not) teach in the classroom.

It is true that teachers, like students, do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). But that does not transform them into the employee *and* employer when it comes to deciding what, when and how English is taught to fifteen-year-old students. Consider the difference between the speech of Evans-Marshall and Marvin Pickering, teachers both. When Pickering sent a letter to the local newspaper criticizing the school board, he said something that any citizen has a right to say, and he did it on his own time and in his own name, not on the school's time or in its name. Yet when Evans-Marshall taught 9th grade English, she did something she was hired (and paid) to do, something she could not have done but for the Board's decision to hire her as a public school teacher. As with any other individual in the community, she had no more free-speech right to dictate the school's curriculum than she had to obtain a platform—a teaching position—in the first instance for communicating her preferred list of books and teaching methods. "[N]o relevant analogue" exists between her in-class curricular speech and speech by private citizens. *Garcetti*, 547 U.S. at 424.

Teachers are not everyday citizens, Evans-Marshall insists, and they have a right "to select books and methods of instruction for use in the classroom without interference from public officials." R.1 ¶ 32. But that is not what Ohio law provides or the First Amendment requires. Start with Ohio law. Under it, "[t]he board of education of each city . . . shall prescribe a curriculum." O.R.C. § 3313.60(A). State law gives elected officials—the school board—not teachers, not the chair of a department, not the

principal, not even the superintendent, responsibility over the curriculum. This is an accountability measure, pure and simple, one that ensures the citizens of a community have a say over a matter of considerable importance to many of them—their children's education—by giving them control over membership on the board.

The First Amendment does not ban this policy choice or this accountability measure. The Constitution does not prohibit a State from creating elected school boards and from placing responsibility for the curriculum of each school district in the hands of each board. Teachers no doubt are "required . . . to speak or write" and otherwise express themselves, *Garcetti*, 547 U.S. at 422, but this does not make them "sovereign[s] unto [themselves]," *Parate v. Isibor*, 868 F.2d 821, 827 (6th Cir. 1989). "The curricular choices of the schools should be presumptively their own—the fact that such choices arouse deep feelings argues strongly for democratic means of reaching them." *Boring v. Buncombe County Bd. of Educ.*, 136 F.3d 364, 371–72 (4th Cir. 1998) (en banc) (Wilkinson, C.J., concurring).

How at any rate would a contrary approach work? If one teacher, Evans-Marshall, has a First Amendment right "to select books and methods of instruction for use in the classroom," R.1 ¶ 32, so presumably do other teachers. Evans-Marshall may wish to teach *Siddhartha* in the first unit of the school year in a certain way, but the chair of the English department may wish to use the limited time in a school year to teach *A Tale of Two Cities* at that stage of the year. Maybe the head of the upper school has something else in mind. When educators disagree over what should be assigned, as is surely bound to happen if each of them has a First Amendment right to influence the curriculum, whose free-speech rights win? Why indeed doesn't the principal, Wray, have a right to defend the discharge on the ground that he was merely exercising *his* First Amendment rights in rejecting Evans-Marshall's curricular choices and methods of teaching? Placing the First Amendment's stamp of approval on these kinds of debates not only would "demand permanent judicial intervention in the conduct of governmental operations," *Garcetti*, 547 U.S. at 423, but it also would transform run-of-the-mine curricular disputes into constitutional stalemates.

That is not the only problem. What employer discipline arising from an employee's manner of teaching—choices of books and the methods of teaching them—does not implicate speech? Could a teacher respond to a principal's insistence that she discuss certain materials by claiming that it improperly *compels* speech? *Cf. W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943). Could a teacher continue to assign materials that members of the community perceive as racially insensitive even after the principal tells her not to? Could a teacher raise a controversial topic (say, the virtues of one theory of government over another or the virtues of intelligent design) after a principal has told her not to? Could a teacher introduce mature sexual themes to fifteen year olds when discussing a work of literature after a principal has told her not to? And "[d]oes a music teacher retain veto power over that most controversial of school productions—the Holiday Concert?" *Evans-Marshall I*, 428 F.3d at 237–38 (Sutton, J., concurring).

Because "one man's vulgarity is another's lyric," *Cohen v. California*, 403 U.S. 15, 25 (1971), or, as one school board member put the point at the November 2001 meeting, "what you might find offensive, I might not," R.46 at 1:41:40, parents long have demanded that school boards control the curriculum and the ways of teaching it to their impressionable children. Permitting federal courts to distinguish classroom vulgarities from lyrics or to pick sides on how to teach *Siddhartha* not only is a recipe for disenfranchising the 9,000 or so members of the Tipp City community but also tests judicial competence. "If even the most happily married parents cannot agree on what and how their own children should be taught, as [we] suspect is not infrequently the case, what leads anyone to think the federal judiciary can answer these questions?" *Evans-Marshall I*, 428 F.3d at 237–38 (Sutton, J., concurring).

The key insight of *Garcetti* is that the First Amendment has nothing to say about these kinds of decisions. An employee does not lose "any liberties the employee might have enjoyed as a private citizen" by signing on to work for the government, but by the same token, the government, just like a private employer, retains "control over what the employer itself has commissioned or created": the employee's job. *Garcetti*, 547 U.S.

at 422.  And that insight has particular resonance in the context of public education. Every child in Ohio must attend school, *see* O.R.C. § 3321.02, providing public school teachers with a captive audience for their in-class speech, *see Mayer*, 474 F.3d at 479, and providing a compelling reason for putting curricular choices in the hands of "someone [they] can vote out of office," *id.* at 479–80, or who is otherwise democratically accountable, *see* O.R.C. § 3311.71 (elected officials and other community institutions appoint school board members in certain municipal school districts).

In concluding that the First Amendment does not protect primary and secondary school teachers' in-class curricular speech, we have considerable company.  The Seventh Circuit invoked *Garcetti* in concluding that the curricular and pedagogical choices of primary and secondary school teachers exceed the reach of the First Amendment. *Mayer*, 474 F.3d at 480.  The Fourth Circuit has not applied *Garcetti* to teachers' in-class speech, *see Lee v. York County Sch. Div.*, 484 F.3d 687, 694 n.11 (4th Cir. 2007), and is sometimes cited as creating a division among the circuits, *see, e.g.*, *Gorum v. Sessoms*, 561 F.3d 179, 186 n.6 (3d Cir. 2009).  But that is because the Fourth Circuit disposed of the teacher's retaliation claim based on pre-*Garcetti* precedent, namely *Connick*, holding that "speech that occurs within a compulsory classroom setting" "does not constitute speech on a matter of public concern" when it is "curricular in nature." 484 F.3d at 695, 697.  The Fourth Circuit's approach changes nothing here:  A teacher's curricular and pedagogical choices are categorically unprotected, whether under *Connick* or *Garcetti*.

The Third Circuit also has declined to resolve the applicability of *Garcetti* to this sort of speech, *see Borden v. Sch. Dist. of Twp. of E. Brunswick*, 523 F.3d 153, 171 n.13 (3d Cir. 2008), but that too makes no difference.  Its pre-*Garcetti* cases hold that, "although [a teacher] has a right to advocate outside of the classroom for the use of certain curriculum materials, he does not have a right to use those materials in the classroom." *Edwards v. Cal. Univ. of Pa.*, 156 F.3d 488, 491 (3d Cir. 1998) (Alito, J.). The Tenth Circuit has applied *Garcetti* to a school teacher's speech *about* curriculum

and pedagogy, even when made outside the classroom, *see Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1204 (10th Cir. 2007), but has not addressed *in-class* curricular speech. The Second Circuit determined, in an unpublished decision, that it need not resolve whether a teacher's in-class speech is governed by *Garcetti* or by its earlier cases applying the "reasonably related to legitimate pedagogical concerns" standard of *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 273 (1988). *See Panse v. Eastwood*, 303 F. App'x 933, 935 (2d Cir. 2008). Other courts of appeals, including this one, have applied *Garcetti* in rejecting school employees' speech claims, though not in the context of curricular and pedagogical choices. *See, e.g.*, *Fox v. Traverse City Area Pub. Sch. Bd. of Educ.*, 605 F.3d 345, 349 (6th Cir. 2010); *Williams v. Dallas Indep. Sch. Dist.*, 480 F.3d 689, 694 (5th Cir. 2007); *Gilder-Lucas v. Elmore County Bd. of Educ.*, 186 F. App'x 885, 887 (11th Cir. 2006). The common thread through all of these cases is that, when it comes to in-class curricular speech at the primary or secondary school level, no other court of appeals has held that such speech is protected by the First Amendment.

Our decision also respects Sixth Circuit authority. In *Cockrel* and in our initial decision in this case, we held that a school teacher's curricular and pedagogical choices (1) are "speech," (2) touch on "matters of public concern" and (3) may satisfy *Pickering* balancing depending on the circumstances developed in discovery or at trial. We do not disturb those holdings and indeed have ruled for the plaintiff on each one of these points today.

Not one of these Sixth Circuit cases, however, addressed whether in-class curricular speech survives the threshold inquiry announced in *Garcetti*: whether the speech was "pursuant to" the claimant's official duties. 547 U.S. at 421. How could they? *Garcetti* came down *after* both decisions and established a new threshold requirement in this area. Evans-Marshall's failure to satisfy this requirement governs us here. "[A] plaintiff may not run home before she reaches first base." *Weathers v. Lafayette Parish Sch. Bd.*, 520 F. Supp. 2d 827, 837 (W.D. La. 2007).

Nor can Evans-Marshall sidestep this conclusion on the theory that *Garcetti* does not apply. In his dissent in *Garcetti*, as Evans-Marshall points out, Justice Souter raised concerns about the applicability of the decision to "academic freedom in public colleges and universities." 547 U.S. at 438 (Souter, J., dissenting). The majority disclaimed any intent to resolve the point. *See id.* at 425 (majority opinion) ("Justice Souter suggests today's decision may have important ramifications for academic freedom . . . . We need not, and for that reason do not, decide whether the analysis we conduct today would apply in the same manner to a case involving speech related to scholarship or teaching.").

*Garcetti*'s caveat offers no refuge to Evans-Marshall. She is not a teacher at a "public college[]" or "universit[y]" and thus falls outside of the group the dissent wished to protect. The concept of "academic freedom," moreover, does not readily apply to in-class curricular speech at the high school level. As a cultural and a legal principle, academic freedom "was conceived and implemented in the university" out of concern for "teachers who are also researchers or scholars—work not generally expected of elementary and secondary school teachers." J. Peter Byrne, *Academic Freedom: A "Special Concern of the First Amendment"*, 99 Yale L.J. 251, 288 n.137 (1989). "[U]niversities occupy a special niche in our constitutional tradition" and the constitutional rules applicable in higher education do not necessarily apply in primary and secondary schools, where students generally do not choose whether or where they will attend school. *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 724–25 (2007).

Even to the extent academic freedom, as a constitutional rule, could somehow apply to primary and secondary schools, that does not insulate a teacher's curricular and pedagogical choices from the school board's oversight, as opposed to the teacher's right to speak and write publicly about academic issues outside of the classroom. "[I]t is the educational institution that has a right to academic freedom, not the individual teacher." *Borden*, 523 F.3d at 172 n.14. Academic freedom implicates "[t]he freedom of a university to make its own judgments as to education," *Regents of Univ. of Cal. v. Bakke*,

438 U.S. 265, 312 (1978) (opinion of Powell, J.), requiring "deference to a university's academic decisions," *Grutter v. Bollinger*, 539 U.S. 306, 328 (2003). *See Sweezy v. New Hampshire*, 354 U.S. 234, 263 (1957) (Frankfurter, J., concurring). In the context of in-class curricular speech, this court has already said in the university arena that a teacher's invocation of academic freedom does not warrant judicial intrusion upon an educational institution's decisions: "The First Amendment concept of academic freedom does not require that a nontenured professor be made a sovereign unto himself." *Parate*, 868 F.2d at 827. A school "may constitutionally choose not to renew the contract of a nontenured professor" when that professor's "pedagogical attitude and teaching methods do not conform to institutional standards." *Id*. Just so here.

## III.

For these reasons, we affirm the judgment of the district court.