NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0186n.06

Case No. 21-5704

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

FILED
May 02, 2022
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| CHRISTOPHER ANDERSON; JAMES "J.J." HATMAKER, | ) ) ) | |
| Plaintiffs-Appellants, | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| v. | ) | THE EASTERN DISTRICT OF |
| | ) | TENNESSEE |
| CITY OF JELLICO, TENNESSEE, | ) | |
| Defendant-Appellee. | ) ) | |

Before: SUTTON, Chief Judge; WHITE and THAPAR, Circuit Judges.

SUTTON, Chief Judge. The First Amendment does not "constitutionalize the employee grievance." *Connick v. Myers*, 461 U.S. 138, 154 (1983). But that is what police officers Christopher Anderson and J.J. Hatmaker seek, asking us to second-guess the city's decision to fire them for objecting to changes in the Jellico Police Department at a city council meeting. Because Anderson and Hatmaker spoke as police officers about internal office affairs, we affirm the district court's decision granting summary judgment to the city.

I.

The citizens of Jellico, Tennessee, elected Dwight Osborn as their mayor in November 2018. Osborn wanted to make some changes to the city's police department. Three days after he took office, he called a meeting with all of Jellico's police officers, a group led by Chief

Christopher Anderson and Assistant Chief J.J. Hatmaker. Two members of the Police and Fire Committee also attended, including the committee's new chair, Alderwoman Sandy Terry.

The meeting covered several topics. Osborn wanted the officers to use more courteous language when interacting with the public, and he proposed a more formal police uniform and increased use of marked police cars. He asked the officers to spend more time on patrol in hopes of decreasing the amount of drug use and prostitution. The officers claim that Osborn asked them to clean up the city's homelessness problem by arresting homeless individuals. The meeting also addressed the department schedule. Osborne asked that the two supervisory officers, Anderson and Hatmaker, work different shifts and that the officers spread their shifts over the course of the day to minimize overtime.

A few weeks later, Osborn and Terry put this overhaul of the police department in motion. At a city council meeting on January 3, 2019, Terry proposed hiring a new full-time and a new part-time officer. Osborn and Terry hoped the new officers would cut back on police overtime while keeping two officers on duty. Osborn complained that the previous schedule had "maximized [o]vertime" and that the city had paid $53,000 in police overtime and related costs over the past year. R.30-19 at 4. Alderman Alvin Evans asked Anderson whether the new hires would solve this problem, and Anderson responded that he did not know. Evans then stated that Terry and Anderson should work together to select the best candidates, at which point Osborn recommended not including Anderson in the process. After the council approved the new hires and Osborn's recommendation, Terry collected resumes, interviewed the candidate with the most police experience, and recommended hiring him full time.

Anderson and Hatmaker resisted these developments. Anderson spoke with the district attorney about the mayor's request that they arrest homeless people. Hatmaker consulted with the

Municipal Technical Advisory Service, an office within the University of Tennessee that provides advice on legal issues to municipal governments, about whether the mayor or police chief had authority to make hiring decisions and set schedules. Hatmaker also spoke with several council members about his concerns, and they encouraged him to raise them at the council meeting. Alderwoman Sarah McQueen testified that she and Hatmaker discussed suspending the rules of order in case Osborn attempted to use them to break from routine. "[U]sually," in her words, when the council had a meeting, "we would let the chief of police or [Hatmaker] speak when it was something to do with the police department. And it may not have been a line item on the agenda, but it was just known, if you have a department head and we're speaking about that department, that's a time for them to speak." R.30-5 at 10.

The next council meeting occurred on January 17, 2019. Anderson and Hatmaker attended. That was not unusual, as Anderson or Hatmaker typically attended every city council meeting and often spoke about law-enforcement policy at the meetings. Both men wore their uniforms to the meeting.

In the Police and Fire Committee's portion of the meeting, Alderwoman Terry presented her choice for the police department opening. Another alderman asked whether the police department had been consulted, and Terry invited Anderson to address the issue, as did McQueen, who stated that Anderson "would probably be the best person to talk about the policy procedure over the Police Department." R.30-13 at 6. Anderson stated that he knew Terry's chosen candidate and had no objection to him but argued that the chief of police should have a role in hiring decisions. Osborn countered that the Police and Fire Committee had hiring authority under a city ordinance and told Anderson to "have a seat." *Id.* at 7. Alderwoman McQueen moved, and

3

the council agreed, to suspend the rules of order "to give the Police Officers a chance to voice their concerns as it is their duty to protect us." *Id.*

Hatmaker argued that the police chief controlled scheduling and hiring under the department manual. In response to McQueen's question about whether the police chief set the schedule, Hatmaker declared that police officers answered to "the Chief of Police, not the damn Mayor." *Id.* at 9. Osborn then told Hatmaker to "sit down." *Id.* At that point, Anderson asked to speak, insisting that the council "go ahead and take a vote to terminate me" because he did not want to have to deal with this friction for the rest of Osborn's term. *Id.* at 10.

At McQueen's invitation, Hatmaker read a statement into the record. Noting that "we are[] a Police Department like any other Police Department," he explained how scheduling only one police officer per shift would make it impossible for that officer to "work a wreck and then get called to a bank robbery or a school shooting." *Id.* at 13. He mentioned that "[t]his scheduling and this micromanaging is putting the safety of the public at risk." *Id.* at 14. After more objections to "micromanag[ing]" the department, he concluded that allowing the mayor to schedule police officers "is endangering your lives, your family's lives, [and] your school children." *Id.* at 14–15.

One week after the council meeting, Osborn suspended Anderson and Hatmaker for failing to follow the chain of command, disturbing a meeting, and violating other city policies. In February 2019, the Police and Fire Committee fired both officers. Anderson and Hatmaker sued the city on a variety of federal and state grounds, including a § 1983 First Amendment retaliation claim. The city moved for summary judgment. The district court granted the motion with respect to the federal claims and dismissed the state-law claims without prejudice to refiling them in state court.

II.

In order to hold the City of Jellico liable under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), Anderson and Hatmaker allege that the mayor and aldermen's retaliation against them constitutes an official custom or policy of the city and that the city failed to train its officials concerning constitutional rights. But *Monell* liability does not arise in the absence of an underlying constitutional injury. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986). We thus need not delve into the city's customs or training if the First Amendment does not protect the officers' speech in the first instance. It does not.

*Garcetti v. Ceballos* paces out one of the boundaries of constitutionally protected speech by public employees under the First Amendment. 547 U.S. 410 (2006). It holds that employees who "make statements pursuant to their official duties . . . are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421. *Garcetti* involved a deputy district attorney who alleged retaliation after he prepared a memorandum for his superiors recommending dismissal of a prosecution and criticizing the warrant prepared by the sheriff's department. *Id.* at 414–15. The Court held that "the fact that [the deputy] spoke as a prosecutor fulfilling a responsibility to advise his supervisor about how best to proceed with a pending case" was dispositive in denying him relief. *Id.* at 421.

"The critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane v. Franks*, 573 U.S. 228, 240 (2014). Several sharpening questions aid the inquiry: What was the "impetus" of the speech? How did it relate to "the employee's job duties"? What was the "setting" of the speech? Who was the "audience"? *DeCrane v. Eckart*, 12 F.4th 586, 596 (6th Cir. 2021).

5

Gauged by these considerations, Anderson and Hatmaker's speech was not protected. The speech fell squarely within their existing job duties, to start. As the senior officers in the department, Anderson and Hatmaker regularly attended city council meetings and weighed in on agenda items involving the police. The police manual documents that Anderson had the duty to "provide advice to the Board of Mayor and Alder[s] and governing body on matters pertaining to the Police Department." R.30-15 at 6. Although the manual does not establish the same with respect to Hatmaker, he had represented the police department at city council meetings in the past and had this "de facto" responsibility as well. *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 544 (6th Cir. 2007) (noting that *Garcetti* "implicitly recognized" that "de facto duties can fall within the scope of an employee's official responsibilities"). Hatmaker also had another council-facing duty, presenting revisions of the department manual to the city attorney and council as part of his role as assistant chief. The officers spoke in line with these established duties when Alderwomen Terry and McQueen asked for their opinions during the Police and Fire Committee portion of the council meeting. The speech "owe[d] its existence to [the officers'] professional responsibilities." *Garcetti*, 547 U.S. at 421. Put another way, Anderson and Hatmaker would not have been asked to weigh in on department policies "but for" their position as police chief and assistant chief. *Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 624 F.3d 332, 340 (6th Cir. 2010). "The key insight of *Garcetti* is that the First Amendment has nothing to say about these kinds of decisions." *Id.* at 342.

The setting and audience of the meeting reinforces the conclusion that the officers spoke as employees. They wore their police uniforms and spoke during the portion of the meeting reserved for official business as opposed to citizen complaints. And their audience was the governing body to which they reported. While the parties debate whether the mayor or committee

stood within the officers' "chain of command," the city's municipal code does not equivocate. It says that the Police and Fire Committee "exercise[d] general control of and supervision over the police and fire departments, their officers, [and] members," R.24-1 at 38, and the police manual states that the mayor is the "executive officer" of the department and the board (the mayor and aldermen) is its "governing body," R.30-15 at 5. The reality that other citizens were present at the meeting does not change the identity of Anderson and Hatmaker's immediate audience: elected officials who had the power to fire them.

Since *Garcetti*, we have applied these principles in other retaliation cases, all in ways that defeat the officers' claims. *Wood v. 36th District Court* held that there was no constitutional violation when a court fired a magistrate judge for notifying her superiors about allegedly illegal practices in the way the court approved search warrants and conducted arraignment hearings. No. 21-1313, 2022 WL 500654, at *1–2 (6th Cir. Feb. 18, 2022). The speech, we held, was made in connection with her official duties to "provide[ ] oversight and guidance to the Court's other Magistrate Judges" and "address potential legal and civil rights violations." *Id.* at *5. And the audience of her speech, as here, was "within her chain of command": the chief district judge who had the power to remove her from her position. *Id.*

A police officer's memo to his superior protesting cuts to the department's police dog training program likewise counted "as a public employee carrying out his professional responsibilities." *Haynes v. City of Circleville*, 474 F.3d 357, 364 (6th Cir. 2007). And a county medical director spoke "as an employee" when he wrote to his organization's board protesting changes to his hours and compensation, because he raised these concerns based on his position as the medical director. *Nair v. Oakland Cnty. Cmty. Mental Health Auth.*, 443 F.3d 469, 478 (6th Cir. 2006). The throughline of all these cases is that each officer "spoke in [his] capacity as a

public employee contributing to the formation and execution of official policy." *Mills v. City of Evansville*, 452 F.3d 646, 648 (7th Cir. 2006).

The officers' contrary arguments do not gain traction. Invoking *DeCrane*'s observation that we examine the "impetus" for the speech, they argue that they attended the meeting to expose Osborn's alleged abuses of power. But *DeCrane* did not rewrite *Garcetti* to mean that any public-spirited motive (in truth mixed motive) for speaking transforms employee speech into citizen speech. We merely explained that we determine impetus by asking whether "an employee speaks to fulfill a job duty" and consequently "[t]his question, of necessity, requires us to identify the employee's job duties." *DeCrane*, 12 F.4th at 596. If this question simply asked what the employee intended to speak about when he began his communication, there would be no "necessity" that we look to his job duties in determining the impetus for his speech.

The officers point to Alderwoman Terry's statement that she thought they were speaking as citizens during the council meeting. But *Garcetti* does not look to the subjective impression of observers of the speech in determining whether the speaker spoke as a citizen or as an employee. It asks whether the individual spoke in connection with his official duties. In the minutes for the meeting, Alderwoman McQueen called on "the Police Officers" to give their views on law enforcement policy. R.30-13 at 7. As a matter of practice, at least one officer or the other attended every council meeting to express his official views on police policy. In this instance, moreover, several council members encouraged Anderson and Hatmaker to address Osborn and the Police and Fire Committee's changes so that the council could "hear the whole situation out." R.30-2 at 6. That Anderson and Hatmaker were "asked by [their] employer . . . to comment about the very matters that [their] speech addressed" undermines the claim that their speech was made outside the scope of their official duties. *Weisbarth*, 499 F.3d at 544.

The officers separately claim that the district court improperly construed disputed facts in favor of the city. They contest the court's statement that they *chose* not to speak during the citizen complaint portion of the meeting, as they missed that part of the meeting. And they contest the court's statement that they were still in uniform because their uniform consisted of a polo shirt and khakis. It is true a court may grant summary judgment only if "no genuine dispute as to any material fact" exists. Fed. R. Civ. P. 56(a). But each of these words counts. Whether the officers chose to skip the citizen grievance portion is not "material" because they spoke at length during the police business portion of the meeting, which is what marks the speech as being in connection with their official duties. And there is "no genuine dispute" about their uniforms. Regardless of how official their polo and khakis uniforms appeared (Osborn thought they made them look like workers "in a fast food restaurant," R.30-12 at 11), they were readily identifiable as police officers because they wore a uniform bearing the department logo and, according to Osborn, wore their "duty belts and guns." *Id.* at 34. All agree Anderson and Hatmaker were wearing department uniforms.

Anderson and Hatmaker add that, even if their exchange with the council fell under their official duties, their communications with the district attorney and the Municipal Technical Advisory Service would still form the basis for a retaliation claim. But, again, this speech owed its existence to their government employment, as the officers would not have been able to consult with the prosecutor or municipal office "but for" their positions as police chief and assistant chief. *Evans-Marshall*, 624 F.3d at 340.

We affirm.