43 A.3d 111 (2012)
304 Conn. 585
G. Berry SCHUMANN
v.
DIANON SYSTEMS, INC.
No. 18655.
Supreme Court of Connecticut.
Argued May 18, 2011.
Decided May 1, 2012.
*114 Gregory A. Castanias, pro hac vice, with whom were Leon F. DeJulius, Jr., pro hac vice, Daniel A. Schwartz, Hartford, and, on the brief, Cara Ceraso, Bridgeport, for the appellant (defendant).
Stephen J. Fitzgerald, with whom were Joseph D. Garrison, New Haven, and, on the brief, Alinor C. Sterling, Bridgeport, for the appellee (plaintiff).
Gregg D. Adler, Nicole M. Rothgeb, Hartford, and Marc P. Mercier, Manchester, filed a brief for the Connecticut Employment Lawyers Association as amicus curiae.
ROGERS, C.J., and NORCOTT, PALMER, ZARELLA, McLACHLAN, HARPER and VERTEFEUILLE, Js.
NORCOTT, J.
In Garcetti v. Ceballos, 547 U.S. 410, 421, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006), the United States Supreme Court concluded "that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for [f]irst [a]mendment[1] purposes, and the [c]onstitution does not insulate their communications from employer discipline." The principal issue in this appeal requires us to determine whether the rule in Garcetti is applicable in an action brought against a private employer pursuant to General Statutes § 31-51q,[2] claiming that adverse employment actions taken in response to speech made during the course of an employee's job duties amounted to retaliation for the exercise of rights guaranteed by the first amendment to the United States constitution. The plaintiff, G. Berry Schumann,[3] a twelve *115 year employee of the defendant, Dianon Systems, Inc., brought a two count complaint against the defendant, alleging a violation of § 31-51q and common-law wrongful termination of employment, following the defendant's termination of the plaintiff's employment as a senior pathologist. The defendant appeals[4] from the judgment of the trial court, rendered after a jury trial, awarding the plaintiff $10,136,015. On appeal, the defendant claims, inter alia, that the trial court improperly disregarded controlling principles under the first amendment by declining to apply the rule in Garcetti in instructing the jury and in denying the defendant's posttrial motions for a new trial, to set aside the verdict and for judgment notwithstanding the verdict. We conclude that the trial court improperly failed to grant judgment in the defendant's favor on the count of the complaint under § 31-51q because the plaintiff's speech was in the course of his employment duties for the defendant and, therefore, was not entitled to first amendment protection under Garcetti. We further decline to reach the plaintiff's proffered alternative ground for affirmance, namely, that Garcetti is not applicable under article first, § 4, of the constitution of Connecticut, because even if it is properly before us, the plaintiff's speech would not have been protected under the pre-Garcetti standards that he would have us apply.[5] Accordingly, we reverse the judgment of the trial court.
The record reveals the following facts that the jury reasonably could have found, and procedural history. The defendant is a medical testing laboratory located in Stratford, which performs diagnostic tests of biological samples, including tissue and bodily fluid specimens. Among the tests performed is urine cytology, which examines cells found in urine in order to detect various forms of cancer and other abnormalities. The defendant performs tests as ordered by the requesting physicians and, upon completion of the test, generates a report that contains the test results and diagnosis. Once the reports are approved by one of the defendant's staff pathologists, they are sent to the requesting physician.
In December, 1992, the defendant extended an offer of employment to the plaintiff, an experienced cytopathologist.[6] The plaintiff accepted the offer and began to work for the defendant as its director of cytology[7] and cytotechnology[8] in January, 1993, reporting to James Amberson, the then vice president of pathology services and laboratory director.[9]
*116 Before beginning his employment with the defendant, the plaintiff had developed a specialized urine test, called cytodiagnostic urinalysis, which examined hematuria, or "the presence of blood in urine." The plaintiff provided this test to other physicians before he began to work for the defendant. When he joined the defendant in 1993, the plaintiff licensed this test to the defendant under the trade name Microcyte. Although prior to its implementation of Microcyte the defendant had offered other urine diagnostic tests, Microcyte represented an advancement over the defendant's earlier offerings that examined only cells from the bladder or lower urinary tract; Microcyte examined cells above, including the kidney. Because of this distinguishing feature, Microcyte provided a noninvasive alternative to kidney biopsies. Microcyte also had an increased sensitivity for detecting bladder cancer and other abnormalities. In addition, Microcyte offered the benefit of integrating two separate analyses, a cellular analysis and a chemical analysis, into one reporting format. The chemical component focused on chemical analyses of analytes and substances in the urine sample, whereas the cellular component involved the examination of the cells in the urine sample.
Microcyte proved to be a successful diagnostic service for the defendant, and, in 1996, the defendant launched Microcyte II, which modified the original test by integrating DNA analysis as an adjunctive component. This DNA test provided results that included an analysis of the chromosomes within a cell, which indicated, inter alia, if there were an abnormal number of chromosomes. The Microcyte tests continued to be successful from the date of their inception through 2004, and outpaced the defendant's original urine cytology test, Urocyte.
Shortly after Amberson's promotion in 2001 to executive medical director; see footnote 9 of this opinion; the plaintiff, citing personal reasons, resigned as director of the urocytopathology laboratory, a position he had assumed in 1996. The plaintiff continued, however, with his diagnostic and research and development responsibilities as a senior staff pathologist. In that capacity, the plaintiff worked on Microcyte and prostate biopsy samples. At that time, the plaintiff also retained control of his independently owned corporations, which included Schumann Diagnostics, Inc., and Schumann Cytology Laboratories, Inc., and maintained business relationships with other organizations, which included Orion Laboratories, Inc., Diagnostic Oncology CRO, Inc., and the University of Connecticut School of Allied Health Professionals.
In November, 2001, the defendant merged with another laboratory testing company, UroCor, which was located in Oklahoma City, Oklahoma. Thereafter, in early 2003, another company, Laboratory Corporation of America (LabCorp), purchased the defendant. At that time, the testing sites in Oklahoma City and Stratford were both owned by LabCorp. As part of the subsequent standardization process between the two sites, Amberson, who at that time was executive medical director and laboratory director of the Stratford site, was charged with, inter alia, standardizing the terminology used in the urine cytology programs at the two sites.
The standardization process resulted in the creation of a new urine testing service called MicrocytePlus. MicrocytePlus included an additional analytical test, Urovysion, which was a molecular genetics test that utilized fluorescent in situ hybridization technology, a method of examining not just the number of chromosomes in a given cell, but also the quality of those *117 chromosomes. It provided medical professionals with an additional method of monitoring patient health. Urovysion was, therefore, a more sensitive test that could detect and assess the risk of developing or recurring bladder cancer with greater accuracy than could the defendant's standard urine tests. The combination of traditional cytology with Urovysion was the hallmark of MicrocytePlus, and was the genesis of the plaintiff's eventual dispute with the defendant.
Amberson also proposed a new set of diagnostic terms to be used in the reports generated by the new MicrocytePlus testing process. Before MicrocytePlus was offered, standard Microcyte reports, which informed the requesting physician of the test results and the diagnostic impressions made by the interpreting pathologist, used specific diagnostic language that included six diagnostic categories, two of the most obvious being "negative" and "cancer." Amberson's newly proposed terms included five diagnostic categories and was his attempt to resolve the ongoing conflict between the two labs about how many diagnostic categories to use, as well as which ones.
In late January, 2005, Amberson called a meeting of the staff pathologists, which included the plaintiff, and officially presented the new MicrocytePlus product, as well as the new diagnostic terms. Although the plaintiff remained silent throughout the meeting, he was shocked to learn that the MicrocytePlus product was so close to launch in the absence of any clinical research supporting Amberson's proposal to integrate Urovysion into the Microcyte testing profile and roll out a new set of diagnostic terminology. During the presentation, Mary Lachman, another staff pathologist, voiced her concerns that, because Urovysion was a molecular genetics test performed by technicians over whom she had no control, she was not comfortable signing out, or approving, the new MicrocytePlus reports. Amberson did not address Lachman's concerns at the meeting and, shortly thereafter, he removed her from the urine service.
Sometime after the meeting, the plaintiff spoke with Amberson directly to express his disapproval of MicrocytePlus. He specifically told Amberson that he took issue with the lack of clinical research supporting the reasoning and methodology behind the integrated test, and the lack of any validation studies showing that the defendant could accurately perform and replicate the test inside its own facilities. The plaintiff also told Amberson that the proposed diagnostic language, which adopted the diagnostic terms from a different classification system, was inappropriate for urine cytology results, could confuse the requesting physicians and, ultimately, harm patients. The plaintiff explained to Amberson that these changes posed a safety issue and that it was Amberson's responsibility to ensure that patient safety was being maintained.
The plaintiff also voiced his objections to others, relaying his concerns to Lachman, telling Joan Parise, a senior cytotechnologist on the Microcyte service, that he "didn't understand how Microcyte worked" and that this new service went against what they had built, and telling Joanne Miller, the lab oratory manager, that he could not "sign out a reporting or testing where [he] didn't understand where the information came from, how it was developed" or "sign out language which nobody had explained to [him] what it means...."
The defendant officially launched MicrocytePlus on or about February 1, 2005. The plaintiff, upon his return from a vacation in March, met with Amberson and Miller, at which time Amberson removed the plaintiff from urine services and explained *118 to him that he could not "go into the room that's providing that service unless you do the MicrocytePlus the way we want to do [it]." The plaintiff continued to work on the prostate biopsy service and to sign out a limited number of urine cases. The plaintiff also tried to resolve the conflict he had with the use of MicrocytePlus, to no avail.
Finally, on Monday, April 4, 2005, Amberson and Pat Noland, the defendant's business leader, met with the plaintiff upon his arrival at work. Amberson and Noland explained to the plaintiff that there had been a meeting scheduled the previous Friday, April 1, which the plaintiff had missed because he had spent that day in Galesburg, Illinois. Although the plaintiff was unaware of this meeting and had taken a personal day, notifying the defendant on the morning of April 1 that he would not be present that day, Amberson and Noland nevertheless proceeded to terminate the plaintiff's employment at that time, citing his unexcused absence and his decision not to use the new diagnostic terms.[10]
The plaintiff, following his termination, was unsuccessful at securing full-time employment. His only income came from two online courses that he offered, a small consulting contract with Diagnostic Oncology CRO, Inc., and unemployment insurance. In addition, in late 2007, the plaintiff sustained out-of-pocket hospital expenses of $192,534.16, which he incurred because he was not covered by employer provided health insurance.
Thereafter, the plaintiff brought this action against the defendant, alleging wrongful termination in violation of § 31-51q and the common law. After the trial court denied the defendant's motion for summary judgment, the case proceeded to a jury trial. The jury returned a verdict in favor of the plaintiff on the count under § 31-51q,[11] awarding him economic damages in the amount of $4,240,211.[12] According to the interrogatories, the jury specifically found that the plaintiff proved, by a preponderance of the evidence, that: (1) "he spoke out on matters of public concern, and that he was motivated to do so as a public citizen rather than for his own private interests"; (2) "his speech was a substantial and motivating factor in [the defendant's] decision to terminate his employment"; and (3) "his speech did not substantially or materially interfere with his bona fide job performance or his working relationship with [the defendant]." The defendant filed motions for remittitur, judgment notwithstanding the verdict, a new trial, and to set aside the verdict (posttrial motions), which the trial court denied.[13] The trial court subsequently *119 granted the plaintiff's motion for attorney's fees, punitive damages[14] and offer of judgment interest, and rendered judgment for the plaintiff in the amount of $10,136,015. This appeal followed.
On appeal, the defendant claims that the trial court improperly disregarded relevant first amendment principles in instructing the jury and in deciding the posttrial motions: (1) by declining to apply Garcetti v. Ceballos, supra, 547 U.S. at 410, 126 S.Ct. 1951 thus subjugating the defendant's own free speech rights in favor of the plaintiff's; and (2) because the plaintiff's speech was not constitutionally protected under, inter alia, Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), since it (a) was not related to a matter of public concern, (b) qualified as insubordinate conduct, and (c) materially and substantially interfered with his job performance and working relationships.[15] In response, the plaintiff contends otherwise, and also posits, as an alternative ground for affirmance, that article first, § 4, of the Connecticut constitution provides him with greater protection than does the federal constitution, and thus precludes the application of Garcetti.[16] Additional facts will be set forth as necessary.

I
We begin with the defendant's claim that the trial court improperly denied its posttrial motions because, pursuant to Garcetti v. Ceballos, supra, 547 U.S. at 410, 126 S.Ct. 1951 the plaintiff's speech, which was made in the course of his job duties as a pathologist, did not constitute constitutionally protected speech actionable under § 31-51q. Specifically, the defendant argues that, under Daley v. Aetna *120 Life & Casualty Co., 249 Conn. 766, 734 A.2d 112 (1999), the trial court was bound to apply Garcetti in deciding the federal constitutional claims brought against it under § 31-51q because that statute "merely applies the first amendment in the private employment context," rendering United States Supreme Court "precedent as the controlling authority in determining the scope of workplace speech." Thus, the defendant contends that the trial court improperly failed to consider the effect of Garcetti on Supreme Court case law previously recognized as controlling, such as Connick v. Myers, supra, 461 U.S. at 138, 103 S.Ct. 1684. In response, the plaintiff contends that the rule set forth in Garcetti is incompatible with § 31-51q, because Garcetti establishes a broad class of employeesthose speaking pursuant to their official dutieswhose speech would be precluded categorically from first amendment protection, while § 31-51q avoids such a broad classification and instead requires proof of actual interference with the employee's job performance or working relationships before excluding employee speech from protection. Citing numerous lower court decisions on point, including a decision from the United States District Court for the District of Connecticut, Trusz v. UBS Realty Investors, LLC, United States District Court, Docket No. 3:09cv268 (JBA), 2010 WL 1287148 (D.Conn. March 30, 2010), the plaintiff also argues that Garcetti, which involved a public employer-employee relationship, should not be applied to the private workplace. Finally, the plaintiff contends that the trial court's failure to apply Garcetti was harmless error not requiring reversal because the plaintiff's speech was not made pursuant to his "official duties." We agree with the defendant and conclude that the trial court improperly failed to apply Garcetti to the plaintiff's first amendment claims brought against a private employer pursuant to § 31-51q.
We first note that "[o]ur review of a trial court's refusal to direct a verdict or to render judgment notwithstanding the verdict takes place within carefully defined parameters. We must consider the evidence, including reasonable inferences which may be drawn therefrom, in the light most favorable to the parties who were successful at trial ... [and] giving particular weight to the concurrence of the judgments of the judge and the jury, who saw the witnesses and heard the testimony.... The verdict will be set aside and judgment directed only if we find that the jury could not reasonably and legally have reached their conclusion." (Internal quotation marks omitted.) Label Systems Corp. v. Aghamohammadi, 270 Conn. 291, 301, 852 A.2d 703 (2004).
We also note that the defendant's claim with respect to whether Garcetti v. Ceballos, supra, 547 U.S. at 410, 126 S.Ct. 1951 applies to private employers for purposes of maintaining an action under § 31-51q, presents issues of constitutional law and statutory interpretation over which we exercise plenary review. See, e.g., HVT, Inc. v. Law, 300 Conn. 623, 629, 16 A.3d 686 (2011) (statutory interpretation under General Statutes § 1-2z); State v. Kirby, 280 Conn. 361, 378, 908 A.2d 506 (2006) (constitutional issues). Moreover, should we determine that Garcetti applies, application of that rule to the facts of this case to determine whether the speech is constitutionally protected thereunder further presents a question of law over which our review is plenary. See, e.g., Jackler v. Byrne, 658 F.3d 225, 238 (2d Cir.2011); accord DiMartino v. Richens, 263 Conn. 639, 661-62, 822 A.2d 205 (2003), citing Connick v. Myers, supra, 461 U.S. at 148 n. 7, 103 S.Ct. 1684; see also DiMartino v. *121 Richens, supra, at 663-64, 822 A.2d 205 (reviewing court conducts "independent review" of factual record and findings as to protected status of speech).

A
We begin with a review of the background legal principles that govern an action brought under § 31-51q, which "creates a statutory cause of action for damages against `[a]ny employer' for `any employee' who has been subjected `to discipline or discharge on account of the exercise by such employee of rights guaranteed by the first amendment to the United States [c]onstitution or section 3, 4 or 14 of article first of the [c]onstitution of the state....' On its face, the statute extends the protection of federal and state constitutional rights in two respects. It provides coverage for private employees as well as for governmental employees, and it imposes liability on private employers as well as governmental employers." Cotto v. United Technologies Corp., 251 Conn. 1, 6, 738 A.2d 623 (1999). In Cotto, we concluded that the protections of § 31-51q were not limited to speech on public property but, rather, extended to employee speech in the private workplace as well. Id., at 16, 738 A.2d 623.
A clear prerequisite to the application of § 31-51q, however, is that the speech at issue must be constitutionally protected; only the "exercise ... of rights guaranteed by the first amendment to the United States [c]onstitution or section 3, 4 or 14 of article first of the [c]onstitution of the state" falls within the ambit of the statute. General Statutes § 31-51q; see Daley v. Aetna Life & Casualty Co., supra, 249 Conn. at 777, 734 A.2d 112 ("[§] 31-51q applies to constitutionally protected speech"); see also Perez-Dickson v. Bridgeport, 304 Conn. 483, 498, 43 A.3d 69, 83 (2012) (rejecting argument that violation of whistle-blowing statute, General Statutes § 31-51m, "can form the basis of a claim pursuant to § 31-51q, even if the employee was not exercising constitutional speech rights").
As a background matter, we note that the case law concerning the first amendment rights of employees by and large addresses claims against governmental employers, for the very elementary reason that there can be no first amendment violation without state action. See, e.g., Cohen v. Cowles Media Co., 501 U.S. 663, 668, 111 S.Ct. 2513, 115 L.Ed.2d 586 (1991); see also Lugar v. Edmondson Oil Co., 457 U.S. 922, 937, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982) (action may be brought against private actor under 42 U.S.C. § 1983 if "conduct allegedly causing the deprivation of a federal right be fairly attributable to the [s]tate," namely [1] "caused by the exercise of some right or privilege created by the [s]tate or by a rule of conduct imposed by the [s]tate or by a person for whom the [s]tate is responsible" and [2] "the party charged with the deprivation must be a person who may fairly be said to be a state actor"). Thus, federal case law concerning the speech rights of government employees is informative insofar as § 31-51q creates a statutory cause of action that serves to vitiate the state action requirement with respect to private sector employers. See Tiernan v. Charleston Area Medical Center, 203 W.Va. 135, 147-48, 506 S.E.2d 578 (1998) (describing relationship of § 31-51q to first amendment state action requirement).
Thus, we next turn to the applicable constitutional principles governing the protected status of employee speech under the federal constitution as interpreted by the United States Supreme Court, wherein it is "well established that a ... government may not compel individuals to relinquish their first amendment rights as a *122 condition to obtaining government employment." DiMartino v. Richens, supra, 263 Conn. at 665, 822 A.2d 205. In "Pickering v. Board of Education, [391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)] ... the court ... recognized that a government has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general. The court then set forth a general principle governing the constitutionality of government restrictions on the speech of its employees: in evaluating the constitutionality of government restrictions on an employee's speech, a court must arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the [s]tate, as an employer, in promoting the efficiency of the public services it performs.... Id.
"In Connick v. Myers, supra, 461 U.S. at 150 [103 S.Ct. 1684] the court added a modification to the general balancing test promulgated in Pickering. Under Connick, if a government employee's speech cannot be fairly characterized as constituting speech on a matter of public concern, it is unnecessary ... to scrutinize the reasons for [his or] her discharge.... The court reasoned that if an employee's speech addresses matters of exclusively private concern, the government interest in latitude [to manage] their offices, without intrusive oversight by the judiciary ... would outweigh the first amendment interests in the speech, absent the most unusual circumstances....
"Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of [the speech], as revealed by the whole record.... An employee's speech addresses a matter of public concern when the speech can be fairly considered as relating to any matter of political, social, or other concern to the community...." (Citations omitted; internal quotation marks omitted.) DiMartino v. Richens, supra, 263 Conn. at 666-67, 822 A.2d 205.
In Garcetti v. Ceballos, supra, 547 U.S. at 413, 126 S.Ct. 1951 which was decided subsequent to our decision in DiMartino articulating the tests in Pickering and Connick, the Supreme Court considered "whether the [f]irst [a]mendment protects a government employee from discipline based on speech made pursuant to the employee's official duties." Garcetti arose from retaliatory actions taken against a prosecutor who had antagonized colleagues and superiors when he criticized, both orally and in writing, the accuracy of a sheriff's affidavit in support of a search warrantat one point recommending the dismissal of the criminal case. See id., at 414-15, 126 S.Ct. 1951. After noting the practical difficulties of applying the principles articulated in Pickering and Connick; see id., at 418-19, 126 S.Ct. 1951; the court then observed that "[g]overnment employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services.... Public employees, moreover, often occupy trusted positions in society. When they speak out, they can express views that contravene governmental policies or impair the proper performance of governmental functions." (Citation omitted; internal quotation marks omitted.) Id., at 418-19, 126 S.Ct. 1951; see also id., at 422, 126 S.Ct. 1951 (The court discussed "precedents... affording government employers sufficient discretion to manage their operations. Employers have heightened interests in controlling speech made by an employee in his or her professional capacity."). The court emphasized that "[u]nderlying [its] cases has been the premise that *123 while the [f]irst [a]mendment invests public employees with certain rights,[17] it does not empower them to `constitutionalize the employee grievance.'" Id., at 420, 126 S.Ct. 1951 quoting Connick v. Myers, supra, 461 U.S. at 154, 103 S.Ct. 1684. Thus, the court concluded that, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for [f]irst [a]mendment purposes, and the [c]onstitution does not insulate their communications from employer discipline."[18]Garcetti v. Ceballos, supra, at 421, 126 S.Ct. 1951; see also id., at 421-22, 126 S.Ct. 1951 (the court noted that "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen," and that first amendment "does not invest [government employees] with a right to perform their jobs however they see fit ... [but] simply reflects the exercise of employer control over what the employer itself has commissioned or created").
Consistent with our decision in the companion case also decided today; see Perez-Dickson v. Bridgeport, supra, 304 Conn. 483, 43 A.3d 69; we agree with the federal circuit courts of appeal that have considered the issue and unanimously have concluded that Garcetti adds a threshold layer of analysis, requiring courts to first determine whether an employee is speaking pursuant to his official duties before turning to the remainder of the first amendment analysis set forth in Pickering and Connick. See, e.g., Leverington v. Colorado Springs, 643 F.3d 719, 724 (10th Cir.2011); Evans-Marshall v. Board of Education, 624 F.3d 332, 343 (6th Cir. 2010), cert. denied, ___ U.S. ___, 131 S.Ct. 3068, 180 L.Ed.2d 889 (2011); Sousa v. Roque, 578 F.3d 164, 170 (2d Cir.2009); Huppert v. Pittsburg, 574 F.3d 696, 703 (9th Cir.2009); Winder v. Erste, 566 F.3d 209, 214 (D.C.Cir.2009); Chaklos v. Stevens, 560 F.3d 705, 712 (7th Cir.2009); Curran v. Cousins, 509 F.3d 36, 44-45 (1st Cir.2007); Foraker v. Chaffinch, 501 F.3d 231, 243 (3d Cir.2007), abrogated on other *124 grounds by Duryea v. Guarnieri, ___ U.S. ___, 131 S.Ct. 2488, 180 L.Ed.2d 408 (2011); Davison v. Minneapolis, 490 F.3d 648, 655 (8th Cir.2007); Vila v. Padron, 484 F.3d 1334, 1339 (11th Cir.2007); Williams v. Dallas Independent School District, 480 F.3d 689, 692 (5th Cir.2007); see also Andrew v. Clark, 561 F.3d 261, 268 (4th Cir.2009). But see Brammer-Hoelter v. Twin Peaks Charter Academy, 492 F.3d 1192, 1202 n. 4 (10th Cir.2007) (noting that Garcetti added new "first step" but that "[d]istrict courts remain free, however, to skip the Garcetti analysis and dismiss or grant summary judgment on the basis of the traditional Pickering analysis when a claim clearly fails because the matters discussed are not matters of public concern"). Thus, we now turn to the principal issue in this appeal, namely, whether the rule in Garcetti applies to private employers as well as public employers, which is an appellate issue of first impression.

B
The defendant contends that precluding the application of Garcetti to private employers in an action brought pursuant to § 31-51q would render the statute "an absurdity" as applied to the health care industry because "[v]irtually every workplace dispute involving a health care worker would become a free speech case... with every employee serving as a roving ombudsman free to overrule her employer," thus creating a "lose/lose situation, no matter what the company does [wherein] someone will be unhappy with the result and could claim a free speech right to refuse to accept the employer's decision." In considering the merit of this argument, we begin with a review of the few cases that have considered this issue, beginning with a Connecticut federal district court decision, Trusz v. UBS Realty Investors, LLC, supra, United States District Court, Docket No. 3:09cv268 (JBA), wherein Judge Arterton concluded that the retaliation claim brought under § 31-51q by a real estate appraiser who had criticized his employer's improper property valuation practices was not subject to Garcetti. In so concluding, the court determined that "Garcetti ... was expressly limited only to employees who work in the public sector; the [c]ourt [in Garcetti] explained that when the respondent in that case ... `went to work and performed the tasks he was paid to perform, [he] acted as a government employee,' and held that `[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen.' ... The Supreme Court in Garcetti did not address any limitations on the exercise of free speech by private employees. Moreover, Garcetti has not been applied to [§] 31-51q." (Citation omitted.) Id., n. 8. The court further rejected the defendants' attempt to extend the logic of Garcetti into the private sector under an argument that "[§] 31-51q and [42 U.S.C. §] 1983 are analogous, and thus, the parameters of their speech protections should be the same." Id. Following the Appellate Court's decision in Cotto v. United Technologies Corp., 48 Conn.App. 618, 629, 711 A.2d 1180, aff'd, 251 Conn. 1, 738 A.2d 623 (1999), the District Court determined that the "obvious difference" between the statutes "is in the context of private employment, because [§] 31-51q covers private employers while [§] 1983 does not.... The Connecticut legislature intended to `provide coverage for the exercise of constitutional rights at a private as well as at a public workplace.' ... Although [f]irst [a]mendment protections extend to private employees in Connecticut, it does not follow that the rationale for public workplace limitations delineated in *125 Garcetti should also apply to private workplaces. As a remedial statute, [§] 31-51q `deserves a generous construction that implements its purpose' ... and the Garcetti [c]ourt explicitly directed its holding only to public employees." (Citations omitted.) Trusz v. UBS Realty Investors, LLC, supra, n. 8;[19] see also Shand v. Martin, United States District Court, Docket No. 2:07-cv-13100, 2008 WL 2229818 (E.D.Mich. May 23, 2008) (declining to apply Garcetti to sports talk radio host employed by private radio station because Supreme Court "limited its express holding to the [f]irst [a]mendment rights of public employees" and "there was nothing about [the plaintiff's] commentary [criticizing the University of Michigan athletic director and the athletic department] that was central to his employment as a radio show host"); cf. McClain v. Pfizer, Inc., United States District Court, Docket No. 3:06-cv-1795, 2008 WL 681481 (D.Conn. March 7, 2008) (denying employer's motion for summary judgment on claim under § 31-51q arising from scientist's continued complaints about way that employer handled waste created during stem cell research, but not citing or considering Garcetti).
We disagree with those cases holding Garcetti inapplicable in the private sector because of their incongruous effect of giving private sector employees greater workplace free speech rights than those afforded to their public sector counterpartsa result plainly not envisioned in the Supreme Court's decision, which recognized that "[g]overnment employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." (Emphasis added.) Garcetti v. Ceballos, supra, 547 U.S. at 418, 126 S.Ct. 1951. Rather, we agree with the reasoning of another federal district court decision revealed by our independent research, namely, German v. Fox, United States District Court, Docket No. 5:06CV00119, 2007 WL 1228481 (W.D.Va. April 26, 2007), aff'd, 267 Fed.Appx. 231 (4th Cir.2008) (per curiam). In German, the plaintiff, who was director of public relations for a private, nonprofit organization that promotes travel in southwestern Virginia, claimed that his employment had been terminated in retaliation for numerous e-mails he had sent to various state officials and employees criticizing the location and facilities of a temporarily relocated welcome center. Id. Determining that state action requirements were satisfied under 42 U.S.C. § 1983 because the plaintiff had alleged that his termination had been coerced by a state official, the court nevertheless *126 concluded that the plaintiff's statements were not protected by the first amendment. Id. The court rejected as "unpersuasive" the plaintiff's claim that "Garcetti is inapplicable to the present case, because it did not involve the termination of a private employee," stating that, "[w]hile Garcetti specifically held that a public employee has no [f]irst [a]mendment protection for job-related `official' speech ... the case did not alter the general rule that private employees are generally entitled to less [f]irst [a]mendment protection than public employees.... To the contrary, in reaching its decision, the Supreme Court emphasized that `[g]overnment employers, like private employers, need a significant degree of control over their employees' words and actions.' ... Thus, the court agrees with the defendants that Garcetti essentially affirms the right of every employer to control its employees' official job-related speech." (Citations omitted.) Id.; see also Kentner v. Timothy R. Downey Ins., Inc., United States District Court, Docket No. 1:03-cv-435-RLY-WTL, 2006 WL 2669468 (S.D.Ind. September 18, 2006) (even if state action requirements were met, first amendment retaliation claims brought against insurance company that was third party administrator for public employee benefit plan failed under Garcetti because speech was made in plaintiff's capacity as defendant's corporate counsel); Logan v. Dept. of Corrections, United States District Court, Docket No. 1:04-cv-0797-SEB-JPG, 2006 WL 1750583 (S.D. Ind. June 26, 2006) (even if state action requirements were met based on conspiracy between defendant private prison health care provider, and state department of correction officials, Garcetti barred claims arising from statements made by health care administrator in course of her employment by defendant).
Moreover, as the defendant notes, applying the rule in Garcetti to retaliation claims brought by employees against private employers under § 31-51q mitigates the potential constitutional risks highlighted by Justice Borden in his separate concurring and dissenting opinion in Cotto v. United Technologies Corp., supra, 251 Conn. at 20, 738 A.2d 623. Although the majority in Cotto declined to consider this point on the ground that the employer in that case did not argue it on appeal; see id., at 7 n. 5, 738 A.2d 623; Justice Borden observed that "interpreting the statute to apply to private workplace conduct could. . . bring two competing sets of expressive rights into conflict, and therefore places the state, in the form of the courts, on one side of that contest. Such a construction raises serious constitutional issues. It is well established that we construe statutes to avoid, rather than to confront, such issues. Castagno v. Wholean, 239 Conn. 336, 344, 684 A.2d 1181 (1996)."[20]Cotto v. *127 United Technologies Corp., supra, 30, 738 A.2d 623; but see also id., at 21, 738 A.2d 623 (Borden, J., concurring and dissenting) (concluding that § 31-51q "does not reach expressive activity . . . that takes place on a private employer's property and involves only restrictive activity by his private, nongovernmental employer"). Applying Garcetti to federal constitutional claims brought under § 31-51q keeps courts from the constitutionally untenable task of, in essence, having to choose sides in a work-related viewpoint dispute between two private actors.[21]
*128 Thus, we conclude that the rule in Garcetti v. Ceballos, supra, 547 U.S. at 410, 126 S.Ct. 1951 applies to claims under § 31-51q grounded in the first amendment that are brought against private employers, and must be considered as a threshold matter prior to undertaking the Pickering/Connick balancing test articulated in DiMartino v. Richens, supra, 263 Conn. at 665, 822 A.2d 205.

C
The plaintiff claims, however, that the trial court's failure to instruct the jury on Garcetti or to apply that rule in the context of the defendant's posttrial motions was harmless error not requiring reversal because the statements at issue were not made in the course of his duties as a pathologist for the defendant. Specifically, the plaintiff argues that the statements are not subject to Garcetti because "the protected speech in issue is not a mere refusal to perform the new testit is statements regarding patient safety. Making these statements was not part of [the plaintiff's job]. His job was to sign out tests.... The limited additional work he did involving standardization of bladder cancer terminology is not to be confused with work on MicrocytePlus.... The development and launch of MicrocytePlus were never [the plaintiff's] responsibilities." Relying on, inter alia, Green v. Board of County Commissioners, 472 F.3d 794 (10th Cir. 2007), and Weintraub v. Board of Education, 593 F.3d 196 (2d Cir.), cert. denied, ___ U.S. ___, 131 S.Ct. 444, 178 L.Ed.2d 344 (2010), the defendant argues, however, that this speech was directly related to, and therefore "part and parcel" of, the plaintiff's duties as a pathologist, and therefore was not constitutionally protected under Garcetti. The defendant emphasizes that the plaintiff's speech was simply a professional disagreement with his supervisors about the best way to process the reports, and therefore was not subject to constitutional protection. We agree with the defendant and conclude that the trial court should have granted the defendant's motion for judgment notwithstanding the verdict on the claim under § 31-51q.
In Garcetti v. Ceballos, supra, 547 U.S. at 424, 126 S.Ct. 1951 the Supreme Court noted that, because it was undisputed that the prosecutor in that case had written the memorandum at issue pursuant to "his employment duties," the court did not need "to articulate [therein] a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate." In dicta, the court "[r]eject[ed], however, the suggestion that employers can restrict employees' rights by creating excessively broad job descriptions.... The proper inquiry is a practical one. Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for [f]irst [a]mendment purposes." (Citation omitted.) Id., at 424-25, 126 S.Ct. 1951.
*129 Subsequent circuit court decisions have, following this dicta, articulated tests for determining whether a statement is made pursuant to an employee's duties for purposes of Garcetti. In Weintraub v. Board of Education, supra, 593 F.3d at 198, 201-202, the Second Circuit rejected a schoolteacher's claim that his filing of a union grievance against administrators who had failed to discipline students was protected under the first amendment and not subject to Garcetti, disagreeing with his contention that only conduct "required" by his employment duties or employer's policies was subject to Garcetti. Rather, the court noted that, under Garcetti v. Ceballos, supra, 547 U.S. at 424, 126 S.Ct. 1951 "[t]he objective inquiry into whether a public employee spoke `pursuant to' his or her official duties is `a practical one,'" and followed the decisions of "other circuit courts[22] [that] have concluded that speech that government employers have not expressly required may still be `pursuant to official duties,' so long as the speech is in furtherance of such duties." Weintraub v. Board of Education, supra, at 202, quoting Williams v. Dallas Independent School District, supra, 480 F.3d at 694. The speech need not be contemplated by the employee's formal job description; see Weintraub v. Board of Education, supra, at 203; as the practical determination requires consideration of "the employee's level of responsibility and the context in which the statements were made." Abcarian v. McDonald, 617 F.3d 931, 937 (7th Cir.2010), cert. denied, ___ U.S. ___, 131 S.Ct. 1685, 179 L.Ed.2d 617 (2011); cf. Chaklos v. Stevens, 560 F.3d 705, 712 (7th Cir.2009) (Garcetti was not applicable to comments made by moonlighting public employee scientists who "signed their letter as employees of ... an outside company. They did not complain to their own supervisors about matters relating to their jobs."). The key inquiry is "whether the speech activity stemmed from and [was of] the type ... that [the employee] was paid to do," and "the ultimate question in determining whether speech falls within an employee's official duties is whether the employee speaks as a citizen or instead as a government employee." (Internal quotation marks omitted.) Rohrbough v. University of Colorado, 596 F.3d 741, 746 (10th Cir.2010); see also Jackler v. Byrne, supra, 658 F.3d at 237 ("[a]s a rule of thumb, activities required of the employee as part of his employment duties are not performed `as a citizen' if they are not `the kind of activity engaged in by citizens who do not work for the government'"). Put simply, on-the-job speech generally is "pursuant to" an employee's duties when it is "part-and-parcel of his concerns about his ability to properly execute his duties." (Internal quotation marks omitted.) Weintraub v. Board of Education, supra, at 203.
*130 It is clear that the dispute in the present case arose from the plaintiff's statements to Amberson about the safety of the Urovysion component of the new MicrocytePlus test and Amberson's proposal of a new set of diagnostic reporting terms, given the apparent lack of clinical research to support those proposals. The plaintiff also criticized the utility and clarity of Amberson's diagnostic language as applied to urine testing results, both to Amberson and other members of the defendant's staff, and refused to use it in connection with the tests that he did perform.[23] Thus, the plaintiff's contention that making statements about patient safety is not part of his job description as a pathologist, and was not requested by the defendant, is inconsistent with the rule of Weintraub v. Board of Education, supra, 593 F.3d at 203, under which speech is "pursuant to" an employee's duties when it is "part-and-parcel of his concerns about his ability to properly execute his duties." (Internal quotation marks omitted.) See also Abcarian v. McDonald, supra, at 937-38 (physician's complaints about risk management, fees and surgeons' abuse of prescription medications were "within the scope" of his responsibilities as chief of surgery at university hospitals); Rohrbough v. University of Colorado, supra, 596 F.3d at 748, 751 (nurse transplant coordinator's communications about "alleged staffing crisis," substandard patient care and heart transplant misallocation were not protected speech under Garcetti because they occurred during work hours and were directed within chain of command); Green v. Board of County Commissioners, supra, 472 F.3d at 800-801 (drug test lab technician's statements criticizing lack of confirmation testing and making arrangements for confirmation *131 testing without consulting her supervisors "stemmed from and were the type of activities that she was paid to do" and therefore were not protected under Garcetti). Moreover, the contentious nature of the plaintiff's dispute with Amberson did not render his speech constitutionally protected under Garcetti, because when an employee has spoken in furtherance of his duties, "the fact that he persists in such speech after a supervisor has told him to stop does not, without more, transform his speech into protected speech."[24]Anemone v. Metropolitan Transportation Authority, 629 F.3d 97, 116 (2d Cir.2011); id., at 99, 116-17 (security director's statements outside chain of command to district attorney about corruption within transportation authority not protected by first amendment), citing Thompson v. District of Columbia, 530 F.3d 914, 918 (D.C.Cir. 2008) ("it would be incongruous to interpret Garcetti, a case concerned with allowing the government to control its employees within their jobs, as giving broader protections to disobedient employees who decide they know better than their bosses how to perform their duties"). Accordingly, we conclude that the plaintiff's federal constitutional claims were barred by Garcetti, and the trial court should have granted the defendant's motion for judgment notwithstanding the verdict on the § 31-51q claim.[25]

*132 II
Supported by the amici curiae, the plaintiff argues, as an alternative ground for affirming the judgment of the trial court, that article first, § 4, of the Connecticut constitution[26] affords broader free speech rights than does the federal constitution and, as such, precludes the application of Garcetti. In support of this claim, both the plaintiff and the amici provide comprehensive independent state constitutional analyses briefed in accordance with State v. Geisler, 222 Conn. 672, 610 A.2d 1225 (1992). The defendant contends, however, that we should not review this claim because, although it was mentioned in the plaintiff's statement of issues raised in the appeal pursuant to Practice Book § 63-4(a), it was not raised before the trial court, wherein the plaintiff's complaint cited only the first amendment as a resource of relevant speech protection and the plaintiff had filed memoranda referring to the state and federal free speech rights protected by § 31-51q as "equivalent." We decline to reach the state constitutional issue raised in the plaintiff's alternative ground for affirmance because, even if it is properly before us notwithstanding our decision in the companion case, Perez-Dickson v. Bridgeport, supra, 304 Conn. at 504, 43 A.3d at 87[27] the plaintiff's speech *133 would not have been protected under the pre-Garcetti standards that he would have us apply.
"Established wisdom counsels us to exercise self-restraint so as to eschew unnecessary determinations of constitutional questions." (Internal quotation marks omitted.) State v. Fernandes, 300 Conn. 104, 111-12, 12 A.3d 925, cert. denied, ___ U.S. ___, 131 S.Ct. 2469, 179 L.Ed.2d 1213 (2011). This is particularly so given the state constitutional issue presented in this appeal, namely, whether Garcetti applies as a matter of state constitutional law[28]a question of particular importance to governmental employers, none of whose interests are represented in this appeal, which involves only private actors. Thus, we review the record to determine first whether it is necessary to engage in adjudication under our state constitution.
With respect to the state constitutional issues presented, we begin by noting that neither the plaintiff nor the amicus; see footnote 16 of this opinion; argues for a state constitutional standard different from the state of the law pre-Garcetti, which required us to apply only the Pickering/Connick balancing test; see DiMartino v. Richens, supra, 263 Conn. at 665, 822 A.2d 205; under which this case was tried.[29] Even assuming without deciding, however, that Garcetti does not apply and *134 the Pickering/Connick balancing test remains the sole state constitutional standard for determining whether public employee speech is constitutionally protected, we conclude that the plaintiff's speech and actions in this case were not constitutionally protected under that rule. Accordingly, it is unnecessary for us to decide the question of whether Garcetti applies under the state constitution.
Specifically, we begin by noting that, although "[t]he Pickering analysis requires particularized balancing based on the unique facts presented in each case"; Voigt v. Savell, 70 F.3d 1552, 1560-61 (9th Cir.1995), cert. denied, 517 U.S. 1209, 116 S.Ct. 1826, 134 L.Ed.2d 931 (1996); whether the plaintiff's speech was constitutionally protected is a question of law subject to "independent" de novo review. See, e.g., DiMartino v. Richens, supra, 263 Conn. at 664, 822 A.2d 205. Only if the evidence, when viewed in the light most favorable to the plaintiff, supported the conclusion that the plaintiff's speech was entitled to such protection should the jury then have been permitted to resolve disputed factual issues, with findings subject to review only for clear error, under the other elements of § 31-51q, such as motivation, causation and whether his speech "substantially or materially interfere[d] with [his] bona fide job performance or the working relationship between the employee and [his] employer. . . ."[30] General Statutes § 31-51q; see, e.g., Beckwith v. Daytona Beach Shores, 58 F.3d 1554, 1560 (11th Cir.1995).
As discussed previously, in "Pickering v. Board of Education, supra, 391 U.S. at 568 [88 S.Ct. 1731] . . . the court . . . recognized that a government has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general. The court then set forth a general principle governing the constitutionality of government restrictions on the speech of its employees: in evaluating the constitutionality of government restrictions on an employee's speech, a court must arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the [s]tate, as an employer, in promoting the efficiency of the public services it performs. . . .
"In Connick v. Myers, supra, 461 U.S. at 150 [103 S.Ct. 1684] the court added a modification to the general balancing test promulgated in Pickering. Under Connick, if a government employee's speech cannot be fairly characterized as constituting speech on a matter of public concern, it is unnecessary . . . to scrutinize the reasons for [his or] her discharge. . . . The court reasoned that if an employee's speech addresses matters of exclusively private concern, the government interest in latitude [to manage] their offices, without intrusive oversight by the judiciary . . . would outweigh the first amendment interests in the speech, absent the most unusual circumstances. . . .
*135 "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of [the speech], as revealed by the whole record. . . . An employee's speech addresses a matter of public concern when the speech can be fairly considered as relating to any matter of political, social, or other concern to the community. . . ." (Citations omitted; internal quotation marks omitted.) DiMartino v. Richens, supra, 263 Conn. at 666-67, 822 A.2d 205.
Although the plaintiff's speech concerning MicrocytePlus related to the patient safety implications of the new testing procedure, which is topically a matter of "public concern"; see, e.g., Springer v. Henry, 435 F.3d 268, 275 (3d Cir.2006); we nevertheless perform the Pickering balancing test to determine "whether the employee's right to speak is outweighed by the . . . employer's interest in the effective operation of the workplace." Dangler v. New York City Off Track Betting Corp., 193 F.3d 130, 139 (2d Cir.1999). "In the Pickering balancing test, several factors are relevant, including: `the extent of the disruption caused by the employee's speech on [1] workplace discipline, [2] harmony among co-workers, [3] working relationships, [4] the employee's job performance, [5] the responsibilities of the employee within the agency and [6] whether the speech is made publicly or privately. . . .'" (Citations omitted.) Id. Further, "[i]n balancing protected [f]irst [a]mendment activity against governmental disruption we take into account the `manner, time, and place' in which [the] speech or activity occurred. . . keeping in mind that the government is more likely to meet its burden when an employee's disruptive activity occurs in the workplace than when the equivalent activity occurs on an employee's own time, away from work." (Citation omitted.) Melzer v. Board of Education, 336 F.3d 185, 197 (2d Cir.2003). "In each case, the ultimate question is whether the employee's right to speak is outweighed by the public employer's interest in the effective operation of the workplace." (Internal quotation marks omitted.) Dangler v. New York City Off Track Betting Corp., supra, at 140. Put differently, "[w]hen considering [the plaintiff's] remarks in the Pickering calculus, we are obliged to look at the ordinary or foreseeable effect of the conduct in controversy and to determine whether it would be reasonably calculated to create division or to have impaired discipline." (Internal quotation marks omitted.) Domiano v. River Grove, 904 F.2d 1142, 1145 (7th Cir.1990).
Applying these principles to the facts of the present case, it is readily apparent that the plaintiff's speech in its entirety was extraordinarily disruptive to his employment with the defendant and, therefore, not constitutionally protected under the Pickering balancing testregardless of whether Garcetti applies. First, all of the speech at issue took place in the work environment, rather than on the plaintiff's own time. Second, the speech greatly interfered with the plaintiff's job performance, as he acknowledges that, although he had been directed to sign out urine cases using the new diagnostic language, he refused to do so because of his concerns regarding the safety and reliability of the new test, performing only prostate biopsy tests and those few urine tests that could be done without the new language. That the plaintiff stopped performing nearly 50 percent of his job responsibilities renders self-evident the disruption caused by his speech on the defendant's efficient office operation.
With respect to the effect of the plaintiff's speech on his relationships with superiors and coworkers, it also is undisputed *136 that the plaintiff's objections to the new test and his refusal to sign out cases using the new diagnostic codes placed considerable strain on his relationship with Amberson, who was not only the plaintiff's supervisor, but also the individual responsible for developing and launching the new diagnostic codes. When Amberson told the plaintiff that he would be removed from the urine service if he persisted in his stance against using the new codes, the plaintiff chose to leave the urine service rather than use the codes. From that time until his termination, the plaintiff worked only half a day on prostate cases, but continued to receive his full salary, a fact that further exacerbated tensions between the plaintiff and Amberson. Finally, the plaintiff's actions stoked division within the defendant's workforce, as the plaintiff, a senior cytopathologist who previously had held high level executive positions with the defendant, was not reticent in expressing his concerns about MicrocytePlus to lower level employees such as Parise, a cytotechnologist, and Miller, a lab oratory manager. See footnote 23 of this opinion.
Finally, because the plaintiff's speech in opposition to the defendant's new diagnostic codes was accompanied by his refusal to use those codes, it was insubordinate in nature, removing it from the ambit of constitutional protection.[31] "[T]he [f]irst [a]mendment's shield does not extend to speech and conduct closely connected with insubordination that impedes an employee's performance of his duties or that interferes with the proper functioning of the workplace."[32] (Internal quotation marks omitted.) Hankard v. Avon, 126 F.3d 418, 422 (2d Cir.1997); see also, e.g., Connick v. Myers, supra, 461 U.S. at 154, 103 S.Ct. 1684 (termination prompted by insubordination that can fairly be predicted to "disrupt the office, undermine [supervisory] authority, and destroy close working relationships . . . [does] not offend the [f]irst [a]mendment"); Moran v. Washington, 147 F.3d 839, 850 *137 (9th Cir.1998) ("[t]he [f]irst [a]mendment simply does not constitutionalize insubordination"). Because application of the Pickering test, even without the Garcetti threshold analysis applicable under the first amendment to the United States constitution; see part I A of this opinion; reveals that the plaintiff's speech was not constitutionally protected and, therefore, not covered by § 31-51q, we simply need not, and do not, decide the issue of whether Garcetti applies under the state constitution.
The judgment is reversed and the case is remanded with direction to render judgment for the defendant on the claim under § 31-51q and for a new trial limited to the plaintiff's common-law wrongful termination claim.
In this opinion ROGERS, C.J., and ZARELLA, McLACHLAN, HARPER and VERTEFEUILLE, Js., concurred.
PALMER, J., concurring.
Although I agree with the majority opinion generally, I wish to note my view that, for the reasons set forth in my concurring opinion in Perez-Dickson v. Bridgeport, 304 Conn. 483, 531, 43 A.3d 69, 103 (2012) (Palmer, J., concurring), I do not believe that the considerations identified in footnote 27 of the majority opinion would be a sufficient basis for declining to review the claim of the plaintiff, G. Berry Schumann, under the state constitution.
ZARELLA, J., concurring.
I agree with the majority opinion in all respects. I write separately because I find General Statutes § 31-51q inapplicable to any speech[1] made by a private sector employee in a private workplace, contrary to the reasoning in Cotto v. United Technologies Corp., 251 Conn. 1, 738 A.2d 623 (1999). Because the parties in the present case have not asked us to reconsider this precedent, however, I express my view with the hope that this court will have the opportunity to reconsider the precedent established by Cotto when it is presented in a future case.
In Cotto, a majority of the court held that § 31-51q extends to protect speech made in the workplace by private sector employees.[2] See id., at 16; id., at 41, 738 *138 A.2d 623 (Katz, J., concurring and dissenting in part). This holding suffers from several analytical weaknesses and leads to problematic results. First, it fails to track the plain meaning of the statutory language, namely, the scope of the protection afforded under the statute. Second, by extending the protections of § 31-51q to the private workplace, Cotto forces the private sector employer to comply with conflicting statutory requirements, subjecting the employer to unavoidable liability under certain circumstances. Third, Cotto creates constitutional concerns by placing the employee's statutorily created free speech right in potential conflict with the employer's constitutional free speech right. Fourth, Cotto, and our related § 31-51q jurisprudence, requires courts to apply United States Supreme Court first amendment precedent regarding public employee speech to the private workplace; see part I of the majority opinion; raising serious conceptual problems.
I begin, as always, with the text of the statute.[3] General Statutes § 31-51q provides in relevant part: "Any employer, including the state and any instrumentality or political subdivision thereof, who subjects any employee to discipline or discharge on account of the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution or section 3, 4 or 14 of article first of the Constitution of the state, provided such activity does not substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and the employer, shall be liable to such employee for damages caused by such discipline or discharge, including punitive damages, and for reasonable attorney's fees as part of the costs of any such action for damages. . . ." (Emphasis added.)
First, in simpler terms, § 31-51q imposes potential liability on any employer, public or private.[4] Second, the statute *139 protects any employee who has been disciplined or discharged in violation of the statute, and allows the employee to recover damages in that circumstance. Third, the statute provides an exception to employer liability if the activity for which the employee was disciplined or discharged interfered with the employee's job performance or employer relationship. The core of § 31-51q, however, is in the meaning of the language "the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution or section 3, 4 or 14 of article first of the Constitution of the state. . . ." As the following analysis makes clear, although this language extends certain protections to private employees, it does not create a new right of free speech in the private workplace.
"The first amendment of the United States constitution, stated generally, guarantees freedom of religion, freedom of speech, freedom of the press, and the rights of peaceable assembly and to petition the government for a redress of grievances. It is axiomatic that the first amendment, which applies to the states through the due process clause of the fourteenth amendment, guarantees those freedoms and rights only against governmental, and not private, action. Rendell-Baker v. Kohn, 457 U.S. 830, 837-38, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982). Freedom of speech traditionally has content only in relation to state actionthe state must be neutral as to all expression, and must not unreasonably restrain speech or expression. The right is to be free of state regulation. . . . Redgrave v. Boston Symphony Orchestra, Inc., [855 F.2d 888, 904 (1st Cir.1988), cert. denied, 488 U.S. 1043, 109 S.Ct. 869, 102 L.Ed.2d 993 (1989)]. A necessary corollary of that fundamental constitutional principle is that the first amendment does not guarantee the conduct contemplated by those freedoms and rights where that conduct takes place on private property and is not restricted or coerced by state action in any way. Lloyd Corp. v. Tanner, 407 U.S. 551, 567, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972); Cologne v. Westfarms Associates, 192 Conn. 48, 56-57, 469 A.2d 1201 (1984). It is also well established that §§ 3, 4 and 14, of article first of the state constitution, which, stated generally, guarantee freedom of religion, speech and the press, and the rights of peaceful assembly and to petition the government for redress of grievances, guarantee those freedoms and rights only against governmental, and not private, action. Cologne v. Westfarms Associates, supra, at 61-63, 469 A.2d 1201.
"Thus, when the legislature referred in § 31-51q to the exercise by the employee of rights guaranteed by the first amendment to the United States Constitution or section 3, 4 or 14 of article first of the Constitution of the state, that language strongly suggests that it was intended to have the same meaning in the statute that it has in its well established constitutional jurisprudence. That meaning plainly is limited to restriction by governmental action." *140 (Internal quotation marks omitted.) Cotto v. United Technologies Corp., supra, 251 Conn. at 26-28, 738 A.2d 623 (Borden, J., concurring and dissenting).
In more concrete terms, § 31-51q protects only private employee speech to the extent that that speech is otherwise constitutionally protected. If a private sector employee were "engaged in expressive activity on public property, such as participating in a peaceful demonstration on a town green against the war with Iraq, or [if] he refused to comply with a governmental demand that he display the American flag, whether on public or his own private property . . . his employer could not, consistent with § 31-51q . . . [discipline] or [discharge] him based on that activity, because he would [be] exercising rights guaranteed to him by the first amendment and article first." (Citation omitted; emphasis in original.) Id., at 26 n. 3, 738 A.2d 623 (Borden, J., concurring and dissenting). Thus, the plain meaning of the statute merely serves to protect private sector employees from job-related repercussions for the otherwise lawful exercise of their constitutional rights. Indeed, if the legislature had intended to create a new right of free speech in the private workplace, it is unlikely that it would have referred to those rights already "guaranteed" by the United States constitution and the Connecticut constitution.
This conclusion finds additional support in an examination of problematic consequences that follow from the contrary reasoning in Cotto. To begin, construing the statute in accordance with Cotto places a private sector employer in a bind. An employer that fails to remedy discriminatory harassment against an employee will be liable to that employee, but an employer that disciplines an employee because of his speech may be liable to that employee under § 31-51q. The following two scenarios better illustrate this problem.
In the first scenario, a newly hired employee at a private company works alongside several coworkers who speak derogatory names and slurs based on sexual orientation. Although the speech is not targeted directly at the individual, it occurs in the employee's presence, behind his back while he is working. Immediately, the employee becomes frustrated, angered and humiliated by this harassment, but, because of his nonconfrontational nature, he does not initially approach his harassers or discuss it with his supervisors. After several years of enduring this, the employee complains to his supervisor, who tries to resolve the issue by arranging a meeting with the employee and his coworkers. The situation improves only temporarily. With the harassment continuing to escalate, the employee retains counsel, elevates his complaints to senior company management, and files a formal complaint with the commission on human rights and opportunities (commission). Responding to commission hearings, the company's management investigates the employee's complaints. Although the company fails to determine if harassment is occurring, it holds a workplace harassment seminar to settle the complaint. Yet the harassment persists. After several additional complaints, the employee brings an action against the company, alleging a hostile work environment because of the harassment on the basis of the individual's sexual orientation and the company's concomitant failure to remedy the environment after learning of it.
Under the relevant antidiscrimination statutes, General Statutes §§ 46a-60 and 46a-81c, and the foregoing facts, the employee might have a cognizable and compensable *141 cause of action against the employer, provided that the employee could prove that a hostile work environment existed and that the employer knew of this environment and failed to take reasonable steps to remediate it. Under these circumstances, the employee's claim, if proven, aligns with one of the purposes of the antidiscrimination statutes, namely, to reduce discrimination by holding employers liable for their failure to take reasonable steps to prevent harassment among coworkers.
Now, consider the second scenario, in which the same company from the preceding scenario hires another employee. Again, the new employee is the target of the same discriminatory harassment by coworkers, and, again, although the harassment does not affect the employee's job performance, he suffers emotionally. This time, however, when the employee complains to his supervisor, the company acts swiftly to remedy the situation, knowing that to do otherwise would subject it to potential liability. The company reasonably determines that the most appropriate remedy is a limited suspension without pay for the harassing coworkers. In response, the suspended coworkers bring an action against the company, alleging that their speech was protected speech under § 31-51q. The coworkers may indeed have a cognizable and compensable claim under Cotto. In these circumstances, the speech would not fall within the statute's exception. It did not interfere with the coworkers' job performance because they continued to perform their duties satisfactorily. Similarly, it did not affect the relationship between the coworkers and their employer because the harassment was not targeted at the employer, and the employer did not itself find the harassment offensive. If the coworkers adequately allege that their speech implicated a matter of public concern,[5] their claim would proceed to trial. If the coworkers succeed in proving all elements of their claim, their employer would be liable for all damages, including punitive damages, caused by their suspension, as well as fees and costs. At a minimum, an employer in this situation would be unable to know how to act to avoid liability under the antidiscrimination statutes while also avoiding liability under § 31-51q.
In addition to placing the employer in an untenable position in situations arising between employees, the interpretation of § 31-51q in Cotto is constitutionally questionable. The creation of a statutory free speech right in the workplace puts the employee's speech in potential conflict with the employer's constitutional free speech right. "Both the United States Supreme Court and this court have held that a private property owner may exclude *142 the public from entering the premises and expressing its views without the owner's consent. . . . If property owners may control the expression that occurs on their own land, it follows that they have the right, protected by the first amendment of the United States constitution, to express their own views on their property, free of government interference." (Citations omitted.) Cotto v. United Technologies Corp., supra, 251 Conn. at 53-54, 738 A.2d 623 (McDonald, J., concurring); see also Citizens United v. Federal Election Commission, ___ U.S. ___, 130 S.Ct. 876, 899, 175 L.Ed.2d 753 (2010) ("[t]he [United States Supreme] Court has recognized that [f]irst [a]mendment protection extends to corporations"). Thus, "interpreting the statute to apply to private workplace conduct could . . . bring two competing sets of expressive rights into conflict, and therefore places the state, in the form of the courts, on one side of that contest. Such a construction raises serious constitutional issues. It is well established that we construe statutes to avoid, rather than to confront, such issues."[6]Cotto v. United Technologies Corp., supra, at 30, 738 A.2d 623 (Borden, J., concurring and dissenting); see also Citizens United v. Federal Election Commission, supra, at 899 ("[T]he [g]overnment may commit a constitutional wrong when by law it identifies certain preferred speakers. By taking the right to speak from some and giving it to others, the [g]overnment deprives the disadvantaged person or class of the right to use speech to strive to establish worth, standing, and respect for the speaker's voice. The [g]overnment may not by these means deprive the public of the right and privilege to determine for itself what speech and speakers are worthy of consideration.").
Finally, serious conceptual complications arise by applying to the private workplace United States Supreme Court first amendment case law, which concerns solely public sector employees. In resolving first amendment issues between a public employer and its employee, the court balances the government's role as an employer with the first amendment prohibition on government interference with speech. "Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services. . . . At the same time, the [c]ourt has recognized that a citizen who works for the government is nonetheless a citizen. The [f]irst [a]mendment limits the ability of a public employer to leverage the employment relationship to restrict, incidentally or intentionally, the liberties employees enjoy in their capacities as private citizens." (Citation omitted.) Garcetti v. Ceballos, 547 U.S. 410, 418-19, 126 S.Ct. *143 1951, 164 L.Ed.2d 689 (2006). This balancing involves additional considerations as well. "[T]he [f]irst [a]mendment interests at stake extend beyond the individual speaker. The [c]ourt has acknowledged the importance of promoting the public's interest in receiving the well-informed views of government employees engaging in civic discussion. . . . The [c]ourt's approach [has] acknowledged the necessity for informed, vibrant dialogue in a democratic society. It suggested, in addition, that widespread costs may arise when dialogue is repressed." (Citations omitted.) Id., at 419, 126 S.Ct. 1951.
Significantly, none of these considerations carries over in equal force, if at all, to a private sector employee's speech in the workplace. A nongovernmental employee does not have, under the United States constitution or the constitution of this state, a freestanding right to speak in the workplace. In other words, the interpretation of § 31-51q in Cotto applies United States Supreme Court first amendment precedent to speech in the private workplace, even though this precedent is based on considerations inapplicable to private sector employers and employees.[7]
The foregoing illuminates the critical weaknesses in our § 31-51q jurisprudence that result from the holding in Cotto. Reexamining the statutory language reveals that Cotto extends § 31-51q beyond its intended purpose and scope. Accordingly, when presented with the appropriate case, I would overrule Cotto and instead follow Justice Borden's concurrence and dissent in Cotto. A proper reading of § 31-51q extends protections to private sector employees only from discipline or discharge as a result of the exercise of their constitutionally guaranteed free speech rights outside of the workplace. It does not protect a private sector employee's speech in the private workplace, regardless of whether that speech was a matter of public concern or made pursuant to his or her job duties.[8]
NOTES
[1] The first amendment to the United States constitution provides in relevant part: "Congress shall make no law ... abridging the freedom of speech...."
[2] General Statutes § 31-51q provides: "Any employer, including the state and any instrumentality or political subdivision thereof, who subjects any employee to discipline or discharge on account of the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution or section 3, 4 or 14 of article first of the Constitution of the state, provided such activity does not substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and the employer, shall be liable to such employee for damages caused by such discipline or discharge, including punitive damages, and for reasonable attorney's fees as part of the costs of any such action for damages. If the court determines that such action for damages was brought without substantial justification, the court may award costs and reasonable attorney's fees to the employer."
[3] The plaintiff died on June 27, 2008. Thereafter, the coadministrators of the plaintiff's estate, Jennifer Schumann and Aaron Schumann, were substituted as plaintiffs in this case. For convenience, we will refer to G. Berry Schumann as the plaintiff.
[4] The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199(c) and Practice Book § 65-1.
[5] Article first, § 4, of the constitution of Connecticut provides: "Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that liberty."
[6] Cytopathology is the "study of disease changes within individual cells or cell types." Stedman's Medical Dictionary (28th Ed.2006) p. 490.
[7] Cytology is the "study of the anatomy, physiology, pathology, and chemistry of the cell." Stedman's Medical Dictionary (28th Ed.2006) p. 489.
[8] Cytotechnology refers to the methodology of testing cells.
[9] Amberson had joined the defendant in 1989 and had helped institute its urine cytology program. From 1994 to 2001, Amberson was the defendant's chief medical officer and laboratory director, and, in 2001, was promoted to executive medical director of anatomic pathology, maintaining his role as laboratory director, as well. At that time, the plaintiff continued to report to Amberson.
[10] The plaintiff had a history of disciplinary issues related to unexcused and unapproved absences. In September, 2001, Amberson instructed the plaintiff that there were to be no more unexcused absences and described the procedure for taking time off. The following month, Amberson reprimanded the plaintiff for a more recent unexcused absence. One month later, the plaintiff was placed on a six month probationary period for an unexcused absence. In June, 2004, Amberson again addressed the plaintiff's unexcused absences, which at times had delayed completion of the plaintiff's daily work.
[11] Pursuant to the jury charge, the jury did not reach the common-law wrongful termination count after finding in favor of the plaintiff on the count under § 31-51q.
[12] The jury awarded the plaintiff $1,369,633 in past economic losses, $2,609,404 in future economic losses, $225,425 in loss of life's enjoyment, past and future, and $35,749 in interest.
[13] The plaintiff died from cancer on June 27, 2008. Following his death, the defendant filed a motion for discovery of the plaintiff's medical records, contending that the plaintiff misled the jury regarding his medical condition. The trial court granted the defendant's motion, and after conducting posttrial discovery, the defendant filed supplemental posttrial motions. In its memorandum of decision on the defendant's supplemental posttrial motions, the trial court summarized the defendant's arguments as follows: "(1) that the plaintiff failed to comply with requests for discovery regarding the nature of his health; (2) that the plaintiff committed fraud; (3) that the plaintiff committed perjury by making a false statement; and (4) that there is newly discovered evidence." After a hearing to determine whether the plaintiff had committed perjury or fraud, the trial court denied the defendant's supplemental posttrial motions.
[14] The jury had determined that the plaintiff had "proved by a preponderance of the evidence that in terminating the plaintiff, the defendant acted with an intentional design to injure his rights to speak out on issues of public concern or with reckless indifference to whether it would injure these rights."
[15] The defendant also claims that the trial court improperly: (1) failed to set aside the jury's award of future damages as based on conjecture and speculation; (2) denied his motion for remittitur; (3) upheld the award of punitive damages in the absence of evidence of bad intent; and (4) instructed the jury with respect to the award of punitive damages and the standard governing common-law wrongful discharge. Because of our conclusion with respect to the issues posed by this appeal related to Garcetti, we need not reach these other claims.

We note that all of the defendant's claims are properly preserved for appellate review. The defendant, in accordance with Practice Book § 16-37, moved for a directed verdict at the close of the plaintiff's case-in-chief, arguing, inter alia, that the plaintiff failed to prove that his speech was constitutionally protected or that his speech did not materially and substantially interfere with his job performance. The trial court, however, reserved judgment on the defendant's motion until the completion of trial. The defendant renewed these arguments in its posttrial motions.
[16] We note that the Connecticut Employment Lawyers Association filed an amicus curiae brief arguing that the rule set forth in Garcetti v. Ceballos, supra, 547 U.S. at 410, 126 S.Ct. 1951 is contrary to § 31-51q, the Connecticut constitution and the decisions of the Connecticut courts.
[17] The Supreme Court further noted that its "employee-speech jurisprudence protects, of course, the constitutional rights of public employees. Yet the [f]irst [a]mendment interests at stake extend beyond the individual speaker. The [c]ourt has acknowledged the importance of promoting the public's interest in receiving the well-informed views of government employees engaging in civic discussion." Garcetti v. Ceballos, supra, 547 U.S. at 419, 126 S.Ct. 1951.
[18] The court then noted that, with respect to the specific case before it, whether the prosecutor had "expressed his views inside his office, rather than publicly, is not dispositive. Employees in some cases may receive [f]irst [a]mendment protection for expressions made at work." Garcetti v. Ceballos, supra, 547 U.S. at 420, 126 S.Ct. 1951. The court also noted that the fact that "[t]he memo concerned the subject matter of [the prosecutor's] employment . . . [is] too . . . nondispositive. The [f]irst [a]mendment protects some expressions related to the speaker's job." Id., at 421, 126 S.Ct. 1951. Rather, the court concluded that the "controlling factor ... is that [the prosecutor's] expressions were made pursuant to his duties as a calendar deputy.... That considerationthe fact that [the prosecutor] spoke . . . fulfilling a responsibility to advise his supervisor about how best to proceed with a pending casedistinguishes [his] case from those in which the [f]irst [a]mendment provides protection against discipline." (Citation omitted.) Id., at 422, 126 S.Ct. 1951; see also id., at 421-22, 126 S.Ct. 1951 (comparing prosecutor to plaintiff in Pickering, "whose letter to the newspaper had no official significance and bore similarities to letters submitted by numerous citizens every day"). For further discussion of the case law exploring the scope of employees' duties for purposes of Garcetti, a matter that the Supreme Court did not need to address in detail in that decision, see Garcetti v. Ceballos, supra, at 424-25, 126 S.Ct. 1951 and part I C of this opinion.
[19] We note that Connecticut Superior Court decisions on this point generally are consistent with the local federal District Court's decision in Trusz v. UBS Realty Investors, LLC, supra, United States District Court, Docket No. 3:09cv268 (JBA). See Lehmann v. Connecticut Legal Rights Project, Inc., Superior Court, judicial district of Hartford, Docket No. CV-05-4018378-S, 2008 WL 4634946 (September 19, 2008) ("[a]t this time, the court is aware of no decision which extends Garcetti to private sector employees such as [the plaintiff, an attorney], and therefore believes that the decision does not apply to this situation"); Dubowsky v. New Britain General Hospital, Superior Court, judicial district of New Britain, Docket No. CV-04-4001320-S, 2006 WL 2676259 (August 18, 2006) (holding Garcetti inapplicable to case brought by maintenance technician against hospital because "speech at issue in the present case was not made by a public employee, such as the prosecutor/plaintiff in Garcetti, whose speech occurred in the course of the fulfillment of his official duties"). But see St. Fleur v. R.C. Bigelow, Inc., Superior Court, judicial district of Fairfield, Docket No. CV-06-5004575-S, 2007 WL 1247306 (April 16, 2007) (assuming, without deciding, that Garcetti applies to actions brought against private employers pursuant to § 31-51q, and denying motion to strike).
[20] In so concluding, Justice Borden relied on Redgrave v. Boston Symphony Orchestra, 855 F.2d 888, 904 (1st Cir.1988), cert. denied, 488 U.S. 1043, 109 S.Ct. 869, 102 L.Ed.2d 993 (1989), wherein the United States Court of Appeals for the First Circuit, in applying the Massachusetts civil rights statute to a claim arising from the defendant's cancellation of the plaintiff's performance based on her expressed support for the Palestine Liberation Organization, stated: "[W]here the issue is the plaintiff's right to free speech, the analogy [to the federal statute prohibiting private racial discrimination] is strained. Such a right traditionally has content only in relation to state actionthe state must be neutral as to all expression, and must not unreasonably restrain speech or expression. The right is to be free of state regulation, so that all private speech is formally on equal footing as a legal matter. In the traditional context, this means that various private actors can, without state interference, battle it out in the marketplace of ideas.

"In the present case, this application of the statute is made doubly unusual because, unlike in the typical discrimination case, there are free speech interests on the defendant's side of the balance as well. The plaintiff's statutory free speech right against the defendant is to be measured against the defendant's constitutional right against the state. If it were to enforce the statute, the state would be entering the marketplace of ideas in order to restrict speech that may have the effect of coercing other speech.
"We have grave concerns about the implication of such a conflict. If constitutional protections are effectively to protect private expression, they must do so, to some extent, even when the expression (or lack thereof) of one private person threatens to interfere with the expression of another.... The courts, noting that free speech guarantees protect citizens against governmental restraints upon expression, have hesitated to permit governments to referee disputes between speakers lest such mediation, even when it flies the banner of protecting speech, interfere with the very type of interest it seeks to protect." (Internal quotation marks omitted.) Cotto v. United Technologies Corp., supra, 251 Conn. at 31-32, 738 A.2d 623 (Borden, J., concurring and dissenting).
[21] The plaintiff, supported by the amici curiae, contends that applying Garcetti is contrary to the language and purpose of § 31-51q, as expressed in its legislative history, which is described comprehensively in Cotto v. United Technologies Corp., supra, 251 Conn. at 9-13, 738 A.2d 623. Specifically, the plaintiff describes as "particularly relevant" the remedial purpose of § 31-51q, and the statement of Senator Howard T. Owens to the effect that § 31-51q was intended to protect "internal whistle-blowers," arguing that Garcetti "chills" such speech. See Cotto v. United Technologies Corp., supra, at 9-10, 738 A.2d 623, citing 26 S. Proc., Pt. 11, 1983 Sess., pp. 3597-3600. The plaintiff's reliance on this debate is, however, misplaced, given that § 31-51q, by its plain language, applies only "to constitutionally protected speech"; Daley v. Aetna Life & Casualty Co., supra, 249 Conn. at 777, 734 A.2d 112; and the legislative debate about the statute's enactment took place twenty-three years prior to the Supreme Court's decision in Garcetti v. Ceballos, supra, 547 U.S. at 410, 126 S.Ct. 1951. See also Tiernan v. Charleston Area Medical Center, supra, 203 W.Va. at 147-48, 506 S.E.2d 578 (The court described § 31-51q as "the only legislative effort in the nation to extend the full gamut of constitutional principles to private employers," and as a response to the fact that, in the absence of statutory enactment, no "state court ... has so applied state constitutional free speech principles to private employers. Likewise, we have discovered no federal court which applies the [f]irst [a]mendment [f]ree [s]peech [c]lause to private employers.").

Further, the text of § 31-51q does not by itself provide whistle-blower protections beyond those afforded by the first amendment, and our opinion in this case does not affect the whistle-blower protections afforded statutorily by General Statutes § 31-51m, which are not at issue in this case. See Tiernan v. Charleston Area Medical Center, supra, 203 W.Va. at 148 and n. 19, 506 S.E.2d 578 (The court emphasized that the conclusion that an "employee does not have a cause of action against a private sector employer who terminates the employee because of the exercise of the employee's state constitutional right of free speech" "does not invalidate nor impact upon the state's whistle-blower laws.... The whistle-blower laws present an independent statutory basis for liability should an employer retaliate against an employee for reporting wrongdoing or waste, as those terms are defined by statute." [Citation omitted.]); see also Garcetti v. Ceballos, supra, 547 U.S. at 425-26, 126 S.Ct. 1951 ("The dictates of sound judgment are reinforced by the powerful network of legislative enactmentssuch as whistle-blower protection laws and labor codesavailable to those who seek to expose wrongdoing.... Cases involving government attorneys implicate additional safeguards in the form of, for example, rules of conduct and constitutional obligations apart from the [f]irst [a]mendment.... These imperatives, as well as obligations arising from any other applicable constitutional provisions and mandates of the criminal and civil laws, protect employees and provide checks on supervisors who would order unlawful or otherwise inappropriate actions." [Citations omitted.]); Cotto v. United Technologies Corp., supra, 251 Conn. at 13-15, 738 A.2d 623 (summarizing various statutes that "safeguard an employee from discharge for expressions of opinion at a private workplace").
[22] The Second Circuit cited decisions from the United States Courts of Appeal for the Fifth, Seventh, Ninth, Tenth and Eleventh Circuits. See Weintraub v. Board of Education, supra, 593 F.3d at 202-203, citing, e.g., Renken v. Gregory, 541 F.3d 769, 773 (7th Cir. 2008) (professor's complaints to university officials about difficulty in administering grant); Brammer-Hoelter v. Twin Peaks Charter Academy, supra, 492 F.3d at 1204 (teachers' discussions about academy's expectations with respect to student behavior, curriculum and pedagogy); Williams v. Dallas Independent School District, supra, 480 F.3d at 694 (athletic director's memoranda seeking information about disposition of funds collected at events); Freitag v. Ayers, 468 F.3d 528, 546 (9th Cir. 2006) (prison guard's internal complaints about supervisors' failure to respond to inmates' sexual harassment of her), cert. denied, 549 U.S. 1323, 127 S.Ct. 1918, 167 L.Ed.2d 567 (2007); Battle v. Board of Regents, 468 F.3d 755, 761 (11th Cir.2006) (university employee's report alleging improprieties in supervisor's handling and management of federal financial aid funds).
[23] We first note that during the period of time before the defendant terminated the plaintiff, he was a senior staff pathologist responsible for working on prostate biopsy cases in the morning and Microcyte cases in the afternoon. The plaintiff testified that, at that time, he worked on between 40 and 175 urine cases per day. After the launch of MicrocytePlus in February, 2005, the plaintiff was still responsible for and was expected to sign out urine cases using the new terminology.

After the launch of MicrocytePlus, however, the plaintiff stopped signing out certain urine tests, conceding that he "declined to perform the MicrocytePlus test...." The plaintiff told Miller, the lab oratory manager, that he could not use the diagnostic language because he "didn't understand where the information came from, how it was developed," and because "nobody [had] explained to [him] what it means, the codes, the terms, the new terms that [they] were using and [he] certainly couldn't sign out because it's approved by the [World Health Organization], their classification system." Following the plaintiff's express refusal to sign out a urine report, the plaintiff met with Amberson and Miller to discuss his objections to this new test. The plaintiff agreed to try and understand Amberson's position, but he continued to decline to use the new codes and, sometime thereafter, was removed from the urine services.
The job related nature of the speech was made clear at trial, when the plaintiff explained that he opposed the new diagnostic language because it "was not consistent with what's in the literature. I was opposed strongly because itI had no research or foundation. I'm very opposed to changing laboratory results or data because it's going to confuse the patientthe physician. These are physician requested testing. So if I confuse the physician, the medical doctor, he's not going to get what he wants. He's not going to do what he should be doing and that that's a safety issue. If thenwhich is even more problematiche's or she's confused is toultimately ... going to confuse that patient. Did I get the right tests or not. I got hematuria, but they worked me up for bladder cancer.... So number one, it can't confuse [the] physician with existing tests I'm trying to distribute. You can't do that." The plaintiff went on to explain that he expressed these concerns to Amberson and "reminded him of our medical responsibilities. I reminded him that he is ultimately responsible for the patient safety. And public awareness is another thing. That he's responsible that what we do is safe and accurate."
[24] Given our conclusion with respect to Garcetti, we need not address in detail the defendant's claims that, as a matter of law, the plaintiff's insubordinate and disruptive speech was not entitled to first amendment protection, other than to note that it is well established that "the [f]irst [a]mendment's shield does not extend to speech and conduct closely connected with insubordination that impedes an employee's performance of his duties or that interferes with the proper functioning of the workplace." (Internal quotation marks omitted.) Hankard v. Avon, 126 F.3d 418, 422 (2d Cir. 1997); see also, e.g., Connick v. Myers, supra, 461 U.S. at 154, 103 S.Ct. 1684 (termination prompted by insubordination that can fairly be predicted to "disrupt the office, undermine [supervisory] authority, and destroy close working relationships . . . [does] not offend the [f]irst [a]mendment"); Domiano v. River Grove, 904 F.2d 1142, 1143, 1146 (7th Cir. 1990) (fire chief's refusal to follow town ordinance "was insubordination justifying dismissal"). Indeed, an actual act of insubordination is not constitutionally required, as the United States Supreme Court does "not see the necessity for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." Connick v. Myers, supra, at 152, 103 S.Ct. 1684; see also Domiano v. River Grove, supra, at 1146 (performing balancing test under Pickering v. Board of Education, supra, 391 U.S. at 568, 88 S.Ct. 1731 and determining that insubordinate actions following otherwise protected commentary were not protected speech). Thus, to the extent that the plaintiff's speech was simply a manifestation of his refusal to do his job in the manner desired by his employer; see footnote 23 of this opinion; it was unprotected under both the first amendment and the language of § 31-51q. See also part II of this opinion for further discussion of the plaintiff's first amendment claims under Connick and Pickering.
[25] Citing Chapman Lumber, Inc. v. Tager, 288 Conn. 69, 952 A.2d 1 (2008), the plaintiff also claims that the general verdict rule requires us to sustain the jury's verdict in this case because the defendant has not negated its basis on his separate claim of a state constitutional violation. The plaintiff contends that the general verdict on the constitutional claims under § 31-51q must be left undisturbed because the defendant failed to brief, in accordance with State v. Geisler, 222 Conn. 672, 610 A.2d 1225 (1992), a separate and independent claim that the state constitution does not provide greater protection than does the first amendment, thus rendering "a proper composition of the verdict . . . conceivable. . . ." Chapman Lumber, Inc. v. Tager, supra, at 115 n. 47, 952 A.2d 1. We disagree. Inasmuch as it is undisputed that the state constitutional issue was not litigated before the trial court, and the plaintiff's claim of entitlement to greater rights under our state constitution is being raised for the first time in this case as an alternative ground for affirmance pursuant to Practice Book § 63-4(a), the plaintiff's general verdict argument is inconsistent with our long-standing approach to constitutional interpretation, namely, that in the absence of a specific claim of entitlement to greater protection under the state constitution, the court and the opposing parties are entitled to presume coextensive protections under both the federal and state constitutions. See Perez-Dickson v. Bridgeport, supra, 304 Conn. at 498, 43 A.3d at 84 citing State v. Gore, 288 Conn. 770, 776 n. 7, 955 A.2d 1 (2008).
[26] See footnote 5 of this opinion. The amici curiae also claim the applicability of article first, § 5, of the Connecticut constitution, which provides: "No law shall ever be passed to curtail or restrain the liberty of speech or of the press."
[27] In the companion case, Perez-Dickson v. Bridgeport, supra, 304 Conn. at 486, 496-98, 43 A.3d at 82-84 we concluded that the rule set forth in Garcetti v. Ceballos, supra, 547 U.S. at 410, 126 S.Ct. 1951 applied to bar an action under § 31-51q brought by the plaintiff, a public school principal who had claimed, inter alia, that her first amendment rights were violated when the defendants, school district administrators, retaliated against her for reporting to the department of children and families that teachers had physically abused two students. After reversing the trial court's decision to the contrary, we then declined to review the plaintiff's alternative ground for affirmance, which had claimed that Garcetti is not applicable under the state constitution. Perez-Dickson v. Bridgeport, supra, at 498, 43 A.3d at 83-84. Noting that the alternative ground for affirmance had not been raised before the trial court, we emphasized that both the trial court and the defendants were entitled to assume that the plaintiff's free speech rights under the state and federal constitutions were "coextensive.. . ." Id., citing State v. Gore, 288 Conn. 770, 776 n. 7, 955 A.2d 1 (2008). Observing that the plaintiff had failed to file a statement of alternative grounds for affirmance under Practice Book § 63-4(a)(1), we cited case law, including New Haven v. Bonner, 272 Conn. 489, 498, 863 A.2d 680 (2005), pursuant to which "[o]nly in [the] most exceptional circumstances can and will this court consider a claim, constitutional or otherwise, that has not been raised and decided in the trial court. . . . This rule applies equally to alternate grounds for affirmance." (Internal quotation marks omitted.) Perez-Dickson v. Bridgeport, supra, at 535, 43 A.3d at 105. "Such exceptional circumstances may occur where a new and unforeseen constitutional right has arisen between the time of trial and appeal or where the record supports a claim that a litigant has been deprived of a fundamental constitutional right and a fair trial. . . . An exception may also be made where consideration of the question is in the interest of public welfare or of justice between the parties." (Internal quotation marks omitted.) Id., at 536, 43 A.3d at 106. Finally, the court will not consider the alternative ground for affirmance unless the appellee establishes that doing so will not prejudice the appellant. Id., at 500 n. 23, 501, 43 A.3d at 85 n. 23.

Applying this standard in Perez-Dickson, we declined to review the proffered alternative ground for affirmance because: (1) the claim was not of constitutional magnitude because claims under § 31-51q concern statutory, rather than constitutional rights, including when the defendant is a public employer; (2) there was no intervening change in the law and the plaintiff had received a fair trial; and (3) doing so conceivably could prejudice the defendants because they did not have the opportunity to consider the possibility of state constitutional claims in appraising the case for settlement purposes, and a conclusion determining a standard different than that established in Garcetti could potentially lead to the expense of a retrial, rather than a directed judgment. Id., at 503, 43 A.3d at 86.
We note that the alternative ground for affirmance raised in the present case is founded on a record similar to that of Perez-Dickson. First, the complaint in the present case did not raise the specter of a state constitutional claim in seeking relief under § 31-51q, a matter that conceivably could have influenced tactical determinations, including settlement valuation, at the trial level. Second, the present case, like Perez-Dickson, presents a purely statutory question under § 31-51q, especially insofar as it involves only private sector actors.
[28] We note that the plaintiff does not claim that our state constitution lacks a state action requirement for purposes of free speech infringement by employersa claim that has met near universal rejection. See, e.g., Edmondson v. Shearer Lumber Products, 139 Idaho 172, 177, 75 P.3d 733 (2003), cert. denied, 540 U.S. 1184, 124 S.Ct. 1426, 158 L.Ed.2d 88 (2004); Tiernan v. Charleston Area Medical Center, supra, 203 W.Va. at 146-48, 506 S.E.2d 578.
[29] We note that, after the parties had completed their closing arguments at trial, the trial court instructed the jury on the elements of the plaintiff's claim under § 31-51q and provided the jury with a verdict form containing the following three interrogatories: "[1] Did [the plaintiff] prove, by a preponderance of the evidence, that he spoke out on matters of public concern, and that he was motivated to do so as a public citizen rather than for his own private interests? . . . If your answer to this question . . . is [y]es, proceed to the next question. [2] Did [the plaintiff] prove, by a preponderance of the evidence, that his speech was a substantial and motivating factor in [the defendant's] decision to terminate his employment? . . . If your answer to this question is . . . [y]es, proceed to the next question. [3] Did [the plaintiff] prove, by a preponderance of the evidence, that his speech did not substantially or materially interfere with his bona fide job performance or his working relationship with [the defendant]?" The jury subsequently answered all three questions in the affirmative.
[30] "For an employee to prevail he or she must also demonstrate that the speech was the motivating factor causing the public employer to take adverse action. . . . Even when the government cannot show a compelling justification under Pickering for infringing on its employee's rights, the government still may succeed if it can demonstrate that it would have undertaken the same adverse employment action even absent the protected speech. . . . By the same token, when the government prevails in the balancing test, the employee may still carry the day if he can show that the employer's motivation for the discipline was retaliation for the speech itself, rather than for any resulting disruption." (Citations omitted.) Melzer v. Board of Education, 336 F.3d 185, 193 (2d Cir.2003), cert. denied, 540 U.S. 1183, 124 S.Ct. 1424, 158 L.Ed.2d 87 (2004).
[31] Notably, the plaintiff's sole response to the evidence adduced by the defendant that the plaintiff's refusal to sign out cases using the new diagnostic terminology substantially interfered with his job performance is that his refusal did not interfere with his employment because, as Amberson testified, the plaintiff was willing to sign out cases using the old diagnostic terminology. The plaintiff's position appears to be that the defendant was obligated to countenance his insubordination so long as he was willing to perform his job on terms that were agreeable to him alone, despite the defendant's "long-standing policy that all pathologists would use the same diagnostic terminology." Not surprisingly, the plaintiff can cite no authority for this proposition.
[32] A comparison of the present case with Domiano v. River Grove, supra, 904 F.2d at 1142, is illustrative of the constitutionally unprotected nature of the plaintiff's speech. In Domiano, the plaintiff, a local fire chief, was removed from his job by the city after he made public statements expressing his intention to disobey a recently enacted ordinance relating to his department's ambulance transportation of patients. Id., at 1144. The plaintiff believed that the new law was unsafe and expressed this view to his colleagues and the media. Id. Applying the Pickering test, the Court of Appeals for the Seventh Circuit concluded that, although the plaintiff's "concern for the safe transport of patients was commendable and his disagreement with the ordinance was certainly protected speech; his adamant refusal to follow the ordinance . . . was insubordination justifying dismissal." Id., at 1146. In contrast to the present case, where the plaintiff stopped performing certain tests, there was no evidence in Domiano that the plaintiff's work had actually been impeded by his disagreement with the new ordinance, that is, that he had actually failed to transport patients in accordance with that ordinance. The court concluded nevertheless that the plaintiff's actions had "undermined department discipline and harmony and ignored [a lawful] directive of [the plaintiff's employer], thereby justifying his dismissal." Id.
[1] In this concurring opinion, I refer to protected "speech" for conciseness, although I recognize that § 31-51q, and its related jurisprudence, is not limited to speech but, rather, extends to any protected activity under the first amendment of the United States constitution and article first, §§ 3, 4 and 14, of the constitution of Connecticut.
[2] Cotto comprises four separate opinions. The opinion announcing the judgment was authored by Justice Peters and joined by Justice Palmer. That opinion, referred to in this concurring opinion and relied on as precedent by the majority in the present case, held that § 31-51q extended its protections to the private sector workplace but upheld the dismissal of the plaintiff's complaint for failing to allege adequately that the plaintiff's speech was otherwise protected speech under the United States constitution or the Connecticut constitution. Cotto v. United Technologies Corp., supra, 251 Conn. at 16, 20, 738 A.2d 623. Three justices, in two separate opinions, concurred in the result that the majority reached but disagreed with the majority's conclusion that § 31-51q extended to the private workplace. Id., at 20-21, 738 A.2d 623 (Borden, J., with whom Callahan, C.J., joined, concurring and dissenting); id., at 53, 738 A.2d 623 (McDonald, J., concurring). Lastly, in a concurring and dissenting opinion, Justice Katz, joined by Justice Borden, agreed with Justice Peters that § 31-51q extended to the private workplace but reasoned instead that the plaintiff's complaint should survive a motion to strike. Id., at 41, 738 A.2d 623 (Katz, J., concurring and dissenting in part).

Thus, four members of the courtJustices Peters, Palmer, Katz and Bordenconcluded that § 31-51q provided a new right that protected employee speech in the private workplace. Id., at 16, 738 A.2d 623; id., at 41, 738 A.2d 623 (Katz, J., concurring and dissenting in part). Three members of the court-Chief Justice Callahan and Justices Borden and McDonaldreasoned that § 31-51q only provided to private employees a cause of action against their employers if the employee engaged in what would otherwise be considered a constitutionally protected activity, and not that the statute extended to employee speech in the private workplace. Id., at 21, 738 A.2d 623 (Borden, J., concurring and dissenting); id., at 53-54, 738 A.2d 623 (McDonald, J., concurring). The principal point of disagreement between the two sides concerned the meaning of the statutory language "on account of the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution or section 3, 4 or 14 of article first of the Constitution of the state. . . ." General Statutes § 31-51q. Neither Justice Peters nor Justice Katz analyzed the meaning of this phrase, and, instead, they appear to have treated it as shorthand for the legislature's intent to extend into the private workplace what previously were only protections against government interference with speech. Justice Borden rejected this reasoning and interpreted the plain meaning of the statute as it appeared from the statutory text. He concluded that private sector employers cannot interfere with an employee's right to be free from government interference with speech but may interfere with the employee's unprotected speech in the private workplace. Id., at 26-28, 738 A.2d 623 (Borden, J., concurring and dissenting).
[3] General Statutes § 1-2z provides: "The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered."
[4] This is clear from its plain language, as Justice Peters' opinion in Cotto accurately notes. "Read literally, the language employed by the legislature unconditionally includes private employers as well as public employers within the terms of the statute. The phraseology of expressly `including' governmental employers is not readily transmuted into the manifestation of an intention of impliedly `excluding' private employers. The use of the word `any' at the outset of the statutory language reenforces its natural reading to encompass rights at a private workplace. Had the legislature meant to confine the statute to the conduct of governmental actors . . . the legislature presumably could have done so directly, by adding `public' or `governmental' before `employer.' To read the statute as limited to governmental actors requires either the deletion of words that the statute contains or the addition of a word that it does not contain. That is not a preferred method of statutory analysis." Cotto v. United Technologies Corp., supra, 251 Conn. at 7, 738 A.2d 623.
[5] As the majority aptly notes, "[a]n employee's speech addresses a matter of public concern when the speech can be fairly considered as relating to any matter of political, social, or other concern to the community. . . ." (Internal quotation marks omitted.) In the scenarios presented in this concurring opinion, then, the coworkers' speech might be considered a matter of public concern if it were grounded in a larger, ongoing discussion of the appropriateness of legalizing same sex marriage. See Kerrigan v. Commissioner of Public Health, 289 Conn. 135, 174-227, 957 A.2d 407 (2008) (noting history and significance of society's acceptance of gay persons). Indeed, even if the coworkers' speech was not in the form of slurs at all, such a discussion might nevertheless create a hostile work environment for a gay employee.

More to the point, the determination of what constitutes a matter of public concern is one made by a trial judge and subject to de novo review on appeal. See DiMartino v. Richens, 263 Conn. 639, 661-63, 822 A.2d 205 (2003). This standard is too nebulous for a private sector employer to know whether, under the interpretation of § 31-51q in Cotto, an employee's workplace speech is protected.
[6] Justice Borden provides an example of this potential conflict: "Assume that a private employee, whose workstation is an isolated cubicle, displays in his cubicle in such a way that only he can see it, a swastika, or perhaps a bumper sticker favoring a Ku Klux Klan candidate for public office. Assume further that it does not interfere with his job performance, and that for all practical purposes he works alone, so that there is no viable claim that the display will interfere with his relationship with his employer. Nonetheless, his employer demands that he remove it, solely because the employer does not want that kind of expression anywhere on his property, and when the employee refuses, the employer discharges him. Applying the statute . . . [to the private workplace] could require us to force the employer to have his property bear an expression that he does not want, thereby favoring the employee's right of expression over that of the employer. At the least, this would raise serious constitutional concerns, and at the most, it would be a clear violation of the employer's right of expression." Cotto v. United Technologies Corp., supra, 251 Conn. at 32-33 n. 6, 738 A.2d 623 (Borden, J., concurring and dissenting).
[7] To the extent that a private sector employee's workplace speech may be relevant to matters of public concernfor example, internal corporate practices dangerous to community safety or the environmentthis speech is already adequately protected by various statutes. See Cotto v. United Technologies Corp., supra, 251 Conn. at 13-15, 738 A.2d 623 (listing statutes). Moreover, under the interpretation of § 31-51q advanced by Justice Borden in his concurrence and dissent in Cotto, an employee also would be protected under that statute if, for example, he lobbied the legislature to adopt laws targeted at preventing dangerous corporate practices.
[8] If this reasoning were applied to the present case, I would conclude that the claims by the plaintiff, G. Berry Schumann, under § 31-51q must fail because his speech occurred at a private sector employer's workplace. Thus, his speech was not protected under our free speech jurisprudence and, therefore, was not within the scope of § 31-51q.